UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

UNITED STATES OF AMERICA,

       Plaintiffs,                Case No. 23-CR-5-JDP-1

-vs-

AUSTIN KOECKERITZ,            Madison, Wisconsin
                           February 2nd, 2023
        Defendant.        10:34 am. - 12:46 p.m.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

STENOGRAPHIC TRANSCRIPT OF DETENTION HEARING
HELD BEFORE MAGISTRATE JUDGE STEPHEN L. CROCKER
(*Transcribed from Digital Recording*.)

APPEARANCES:

For the Plaintiffs:
        United States Attorney's Office
        BY:  TAYLOR KRAUS
        222 West Washington Avenue, Suite 700
        Madison, Wisconsin 53703

        United States Attorney's Office
        BY:  SLAVA KUPERSTEIN
        150 M Street NE
        4CON7
        Washington, DC 20002

Also Present: MICHAEL SUTOR, Probation agent.

For the Defendant:
        Federal Defender Services
        BY:  JOSEPH BUGNI,
            ELIZABETH BLAIR
        22 East Mifflin Street, Suite 1000
        Madison, Wisconson 53703

PHILIP C. HARRELSON, RMR, CRR
United States District Court Reporter
120 North Henry Street
Madison, Wisconsin 53703
1-608-261-5708
\*\*\*

1          (Proceedings called to order at 10:34 AM.)

2          THE CLERK:  All rise.  This Honorable Court is again in

3     session.  Magistrate Judge Stephen L. Crocker presiding.  Please

4     be seated and come to order.

5          Case No. 23-CR-5-JDP-1, *USA versus Austin Koeckeritz*, called

6     for a detention hearing.  May we have the appearances, please.

7          MS. KRAUS:  Good morning, Your Honor.  Taylor Kraus appears

8     for the United States.

9          MR. KUPERSTEIN:  Good morning, Your Honor.  Slava Kuperstein

10    appears for the United States.

11         THE COURT:  Counsel, good morning to both of you.

12         MR. BUGNI:  Good morning, Your Honor.  Joe Bugni and

13    Elizabeth Blair from Federal Defender Services appearing on

14    behalf of Mr. Koeckeritz.

15         THE COURT:  All right.  Mr. Koeckeritz, good morning to you.

16         Counsel, good morning to both of you as well.

17         And on behalf of Pretrial Services today.

18         AGENT SUTOR:  Good morning, Your Honor.  Michael Sutor.

19         THE COURT:  Thank you, Mr. Sutor.  Good morning to you.

20         All right.  We're here for a hearing on the government's

21    motion to detain Mr. Koeckeritz.  I've received and read the

22    pretrial service report docketed as 16.

23         Mr. Bugni, yesterday afternoon, you filed a letter that we

24    docketed as 17.  I've read that.  There were a lot of attachments

25    to it, including mainly interview reports with the alleged victim

1    who we'll call "Jane Doe."

2         As a housekeeping matter, I think identifying information is

3    contained in there.  Any problem with the Court sealing all of

4    that?

5         MR. BUGNI:  It was -- sorry, Your Honor.  It was filed and

6    sealed by the government --

7         THE COURT:  Was it?  Okay.

8         MR. BUGNI:  We agree that it should be filed under seal.

9         THE COURT:  Understood fair enough.  Then -- then that's

10   good.

11        So I've read all that, and let me just give you a little bit

12   of an overview of -- of the Court's starting position, which, of

13   course, is -- is very tentative because I'm very interested in

14   what both sides have to tell the Court.

15        First of all, as the defense acknowledges, this is a

16   "presumption of detention" case, based on the nature of the

17   charge.  Second, notwithstanding the fact that three different

18   plans were proposed -- and Mr. Sutor outlined all three in his

19   report -- the pretrial service report -- or the pretrial service

20   recommendation is continued detention, and I respect Mr. Sutor's

21   opinions.  That -- that's his -- his job.

22        This is a case where the allegations are -- are alarming,

23   but the interview transcripts put a slightly different spin on

24   things; and, as is often the case when we have a detention

25   hearing where there's a presumption of detention, I'm still going

1    to ask the government to start by proffering its reasons for

2    wanting to detain Mr. Koeckeritz.

3         And two things in -- in which I'm interested -- well,

4    actually there's three -- one is in light of the strength of the

5    government's evidence -- the 3142(g) factor -- how would you have

6    the Court review the -- or view the transcripts of -- of the

7    victim interviews that -- that make this seem at -- at least

8    possibly less serious than a one-sided view would be.

9         Two, we've got three different plans.  In the government's

10   view, why would none of these suffice?  Why can we not impose

11   conditions on Mr. Koeckeritz that would suffice?

12        Third, and -- and underlying the government's concern -- and

13   the Court's concern -- is the alleged victim in a safe place.  In

14   other words, I don't know where she is.  I don't want to know

15   where she is.  But something the Court always takes into

16   consideration in a case like this is not only the threat of

17   physical harm but also psychological or emotional harm to the

18   victim.  And that's more true when we have minor victims.

19        And I've actually detained people based on the fact that

20   minor victims, through their parents, have indicated to Pretrial

21   Services that the release of the defendant would be

22   extraordinarily challenging to them emotionally, that they would

23   be very frightened.

24        Now, this is different.  We're not dealing with a minor

25   victim.  And I guess that's 3A, then.  There are allegations that

1    there was a possible minor involved.

2        And, Mr. Bugni, you point out that the Court has had the

3    benefit of looking at a lot of search warrants that have not been

4    turned over yet with the affidavits.  So I'm aware of the

5    allegations out there.

6        And you're right.  It hasn't been charged.  But circling

7    back to 3142(g) -- if the evidence is out there and it's relevant

8    to whether or not Mr. Koeckeritz should be released, I'd like the

9    government to proffer that today if the government is comfortable

10   doing that, but that's your decision to make; okay?  I haven't

11   made a final decision yet.

12       Obviously, Mr. Koeckeritz and the government are entitled to

13   make their full case, but I wanted to let you know what the Court

14   is thinking at the front end as sort of at least a loose

15   guideline as to how we're going to proceed.  And we'll go till

16   we're done.

17       All right.  I don't know who's got the lead for the

18   government today, but the floor is yours.

19       MR. KUPERSTEIN:  Thank you, Your Honor.  I will note that

20   Jane Doe is here today and has provided a statement for us to

21   read, and we will present that at the end of our arguments, so to

22   speak.  And I know the Court has sort of already addressed this,

23   but I do want to make it very clear that we did correct and made

24   sure that it was understood that the labor charge is pertaining

25   to the adult victim; not the minor victim.  And there was

1    reference to a firearm that had not yet been accounted for, and

2    that firearm has -- to our understanding, has since been turned

3    over by Mr. Koeckeritz's prior counsel to -- to authorities.

4            THE COURT:  Understood.  Thank you.

5            MR. KUPERSTEIN:  Thank you.

6            So, Your Honor, the allegations in this case are that in

7    August of 2020, the -- the defendant and victim met via

8    Facebook -- Facebook dating -- just a dating app through the

9    Facebook -- the greater Facebook website.  And within a week,

10   Jane Doe moved in with the defendant; and initially, she

11   describes that the relationship was very -- he was very kind,

12   charming, sort of promised her the world.

13           THE COURT:  Mr. Kuperstein, I'll let you tell me anything

14   you think I need to know, but I must have read six to eight

15   search warrant affidavits in this case.

16           MR. KUPERSTEIN:  Yes, Your Honor.

17           THE COURT:  I know the backstory.  I know about Chaturbate.

18   I know about the bank accounts.  I know about, you know, the

19   allegations of gaslighting and psychological abuse and physical

20   abuse, and I know how everything went south from Jane Doe's

21   perspective.  So you don't have to give me background.

22           MR. KUPERSTEIN:  Yes, Your Honor.

23           THE COURT:  I know that.  Why don't we focus on why you

24   think I should detain Mr. Koeckeritz.  I think that might be a

25   better use of our time.

1      MR. KUPERSTEIN:  Yes, Your Honor.  Thank you.

2      The reason that -- the reason that we feel that

3  Mr. Koeckeritz should be detained is that just the sort of the

4  level of violence -- both physical and sexual.  The defendant,

5  just on a whim, would choke and asphyxiate Jane Doe.  She

6  described instances where he would close her -- you know, pinch

7  her mouth nosed (verbatim) and cover her mouth to prevent her

8  from breathing.  He would lay on top of her and put his entire

9  weight upon her to the extent that she could not breathe.  She

10 couldn't say for sure whether she blacked out during these

11 instances but did report missing time -- like, she would be

12 struggling; and then at one point, she realized that he was no

13 longer on top of her.  This happened several times without

14 provocation.

15     He would, on a whim, punch, push, kick her because he,

16 quote, "thought it was funny."  When she protested it, he

17 would -- he would, you know, tell her to stop being a baby and

18 call her names and degrade her.  He would get up next to her and

19 scream at the top of his lungs in her ear to the point that she

20 would have ringing in her ears for days.  He would force

21 piping-hot food into her mouth that either came out of the

22 microwave or off of the stove and cover her mouth with his hand

23 and force her to have the -- the hot food in her mouth as it

24 burned her.

25     He poured hot oil on her back in a -- in a specific

1  incident.  Even though the police indicated in one report that

2  they were not able to observe it, we do have a safe exam -- or a

3  SANE exam -- in which the nurse noted on -- on her back that

4  there was something that was consistent with that.

5       THE COURT:  Let me interrupt briefly for a clarification.

6  So the SANE examine would have been temporally proximate to the

7  interview in which the police noted that they didn't see it?

8       MR. KUPERSTEIN:  Yes, Your Honor.

9       THE COURT:  Okay.

10       MR. KUPERSTEIN:  Because I -- I believe that it was -- I

11  believe that it was noted as -- as they were -- as they were

12  getting her out of the house or shortly after.  Is that right?

13       MS. KRAUS:  The SANE exam occurred within the next few

14  days --

15       THE COURT:  Okay.

16       MS. KRAUS:  -- on my initial report.

17       THE COURT:  Which gives me the information I'm asking for.

18  Thank you.  Please continue.

19       MR. KUPERSTEIN:  Thank you.

20       There were also incidents where force was threatened -- you

21  know, statements like "if anybody comes to get -- to get you from

22  this house, I will shoot them" -- specifically aimed at her

23  family.  Chased around -- chased her around with a gun on at

24  least two occasions.

25       He would -- when playing with guns, he would -- the

1    defendant would sometimes point a gun at her.  Jane Doe recalls a

2    specific incident where the laser sight was fixed on her; not an

3    incident where he specifically said, you know, "I'm going to do

4    something to you," but nonetheless a firearm was pointed at her,

5    and a firearm was recovered that had a laser site.

6        And the sexual violence, Your Honor -- repeated sexual

7    assaults during which -- you know, started it as sort of not

8    taking "no" for an answer; and if -- if in the middle of the

9    conduct, Jane Doe would resist or say "Stop it," "You're hurting

10   me," it would go -- it would happen at a much more -- the assault

11   would become more intense.

12       And we will also note that we have medical records from this

13   period during which Jane Doe came to the hospital, and it was

14   noted that there were in- -- infections and bleeding in her

15   genital area.  She attributes this specifically to the repeated

16   and consistent assaults that -- that occurred.

17       THE COURT:  And let me interrupt again just for a

18   clarification.  I'm inferring this is separate from the SANE

19   exam, which came later.  I'm also inferring, from the way you

20   phrased it, that there was more than one hospital visit?

21       MR. KUPERSTEIN:  Yes -- yes, Your Honor.  It wasn't

22   hospitalization; it was a -- it was just a -- sort of a -- an

23   office appointment.  Many of those -- and that was during the

24   period that she was still with -- still with the defendant.

25       THE COURT:  And I'm sorry.  I don't mean to make this a pop

1     quiz; but when you say "many of those" -- can we quantify.  Less

2     than ten?  More than ten?  Or do we know?

3          MS. KRAUS:  I don't know that we can quantify that at this

4     time.

5          THE COURT:  Understood.  Please continue.

6          MR. KUPERSTEIN:  There was emotional manipulation -- oh,

7     actually, Your Honor, on the subject of sexual violence, there

8     was also the requirement that if Jane Doe 1 wanted to get off of

9     the streaming early -- that, you know, the defendant -- he said,

10    quote, "Okay.  But you're going to have to give me head."  And

11    this happened on a number of occasions.  When he was asked about

12    this by police, at first he denied it, and then had said, "Okay.

13    Maybe it happened as a joke."

14         Jane Doe was isolated from her family.  Her communications

15    were monitored.  There were cameras on the -- on the exits of the

16    house.  Her finances were completely and totally controlled.  Her

17    social-media use was completely monitored, and very relevant to

18    this case was there was a use of the defendant's minor family

19    member on two incidents -- one, to commit a sexual assault of

20    Jane Doe 1, using the minor family member.  And during this

21    incident, she was restrained by handcuffs, and --

22         THE COURT:  "She" being Jane Doe?

23         MR. KUPERSTEIN:  "She" being Jane Doe.  Yes.  Thank you,

24    Your Honor.

25         And the other incident -- being forced to take a nude photo

1    shoot with the -- with the minor family member.  And the minor --

2    in the interviews, the minor has corroborated these incidents,

3    and the photo shoot was at the direction of the defendant,

4    particularly indicating -- because the minor is a minor, the

5    defendant specifically said, "Okay.  We need to keep her face out

6    of the actual, you know, photos so nobody can identify her."

7         THE COURT:  And, Mr. Kuperstein, let me just clarify my

8    understanding of that incident, which was noted in at least

9    one -- probably more -- of the search warrant affidavits.  The

10   way it was phrased in the affidavits indicated that the photo

11   shoot did not result in images that would rise to the level of

12   child pornography under federal statutes.  Am I recalling

13   correctly?

14        MR. KUPERSTEIN:  We -- we -- we can't -- we can't

15   definitively say that yet, Your Honor.  There -- there are -- we

16   haven't seen the photos yet.  So I would -- I can't say one way

17   or the other.

18        THE COURT:  Which answers my question.

19        MS. KRAUS:  I would just note, Your Honor, that the minor

20   victim did state she was at least nude from the chest down, that

21   Mr. Koeckeritz did direct her at least to place her hand near

22   Jane Doe's genitals.

23        In subsequent interviews, Jane Doe has clarified -- and I

24   should note that it is extremely difficult for her to discuss

25   these particular sexual assaults -- but that Jane Doe did state

1    this did amount to more than just placing one's hands near

2    genitals and that it did result in some sort of digital

3    penetration.  The minor did corroborate that to an extent.  I

4    would just note that it's been difficult for both of these

5    individuals to discuss this.  At this point, we do not have the

6    photographs, but I think it is clear that these were sexual in

7    nature.

8         THE COURT:  Understood.

9         An observation that's sort of a question and -- and then a

10   question.  My recollection of Wisconsin state law is that it's

11   got a broader definition of conduct that violates its child

12   pornography laws, and that exposure of a child's breasts can be

13   prosecuted.  Am I recalling correctly?  I don't mean to make this

14   a pop quiz, but --

15        MS. KRAUS:  Your Honor, you're right.  The federal

16   definition is more narrow than under the state provisions.

17        THE COURT:  Okay.  Thank you.

18        Second, you mentioned a possible digital penetration.  In at

19   least one of the search warrant affidavits, my recollection is

20   that there was an allegation -- or a report of digital

21   penetration of a minor after crossing state lines into the

22   Dekotas.  Is that different from what you're telling me now, or

23   is this the same incident?

24        MS. KRAUS:  It is, Your Honor.  And our -- our theory here

25   is really that that transportation of the minor was kind of a

1  precipitation to the subsequent sexual assaults of Jane Doe with

2  the use of that minor.  The minor did report that upon, you know,

3  visiting South Dakota with Mr. Koeckeritz -- her older

4  half-brother, I should add -- that he did explore digital

5  penetration as well as oral sex with that minor, and that she did

6  also touch his genitals.

7      THE COURT:  Okay.  And just -- as sort of as a fairness

8  issue, how much of this has the defense heard?  I'm seeing heads

9  being shaken.  It's all new to you, correct, Mr. Bugni?

10     MR. BUGNI:  So, Your Honor, we -- we were able to deduce

11 some from the interview transcripts.  As far as not having the

12 photos -- this is the first -- we asked the government what would

13 be the charges that we're superseding.  They declined to tell us.

14 They don't have to tell us.  Many of -- what we're limited to are

15 Jane Doe's interviews that we provided --

16     THE COURT:  Right.  You got them from a different source.

17     MR. BUGNI:  Correct.  And I'll tell you a lot of what we've

18 heard right now is not in those initial five.  And then we have

19 the -- the minor -- we have her interviews as well.  We have, I

20 believe, three; correct?  I think there was -- three interviews

21 with her, and we -- we would proffer a slightly more robust

22 statement of what she says.  You know, I don't recall everything

23 that they -- they've brought up here, but there are -- there are

24 aspects of it, but this isn't my time to talk, so.

25     THE COURT:  Understood.  And we'll go until we're done.

1          All right.  Back to the government.

2          MR. KUPERSTEIN:  Your Honor, the -- so the Sioux Falls

3     trip -- that -- that incident -- the minor victim reports that

4     the defendant specifically said, you know, this is -- you know,

5     this is a place for -- this is an opportunity for safe

6     exploration.  This is -- it's my duty, as your older brother, to

7     provide you a safe space, to -- to, you know, discover yourself

8     sexually, and that happened before this particular incident -- or

9     these particular incidents wherein the sexual assault, using --

10    using the minor to assault Jane Doe and the photo shoot happened.

11         We -- the minor reports that the -- that the defendant

12    started to have -- have the minor dress up in a furry costume,

13    using -- to -- basically a -- you know, a cartoon-animal sort of

14    costume, where --

15         THE COURT:  Right.  This was in the search warrant

16    affidavit.  So I remember that; but, obviously, the defense

17    attorneys haven't heard this yet.

18         MR. KUPERSTEIN:  Right.  So to promote -- to help promote

19    Jane Doe's -- Jane Doe's streaming services.

20         THE COURT:  Let me interrupt before you move on because

21    Mr. Bugni just mentioned that from the defense's perspective, any

22    new charges involving child pornography might be based on

23    locating the photographs; but because there was a trip across

24    state lines in which there were sexual acts alleged by the

25    government that Mr. Koeckeritz performed on the minor -- is that

1    also in play in terms of a possible charge or not so much?

2         MR. KUPERSTEIN:  Those -- those charges are certainly

3    possible.  There are other charges that we were exploring.

4         THE COURT:  Okay.  Were you planning on sharing those with

5    the Court today, or is that -- is it just too early to put that

6    into the record?

7         MR. KUPERSTEIN:  It's too early to put that into the record,

8    Your Honor.

9         THE COURT:  Okay.  Do you need a break?

10        MR. KUPERSTEIN:  Your Honor, if we can just have --

11        THE COURT:  Yes.

12        MR. KUPERSTEIN:  90 seconds.  Thank you.

13         (A discussion is held off the record at 10:54 AM.)

14        MS. KRAUS:  We just were advised that Jane --

15        THE COURT:  Let's wait for Mr. Bugni to return.  Okay.

16    Let's continue.

17        MS. KRAUS:  That Jane Doe did leave the courtroom.  Just

18    wanted to make a note of that.  That was the discussion we just

19    had with our colleagues.

20        MR. KUPERSTEIN:  And I'm sorry, Your Honor.  So --

21        THE COURT:  We were at the furry costume.

22        MR. KUPERSTEIN:  So the costume -- thank you, Your Honor --

23    that costume -- you know, the name of the specific directions

24    that the defendant gave the minor is to choose a user name that

25    indicated that the -- that the account could -- could become

1    sexual in nature, that -- and basically had her generate content

2    that would -- that would -- that would be used to promote Jane

3    Doe 1's streaming services.  We're not alleging that those

4    particular posts themselves showed any explicit imagery or

5    anything like that; however, it is relevant to the use of the

6    minor in furtherance of this whole enterprise.

7         So, Your Honor, I think your first question was how to view

8    the transcripts of the victim's interview that were provided.

9    Obviously, defense doesn't have everything that we have.  We've

10   had subsequent interviews with -- with the victim.  We've -- as

11   well as the -- as well as the minor.  The -- the -- these initial

12   interviews are just that:  Initial interviews.  We've had an

13   opportunity to continue to explore exactly specifically the

14   things that happened.

15        And the breadth and depth of the violence and manipulation

16   is extraordinary.  The defendant terrorized Jane Doe for the

17   better part of two years in all of the ways that -- that we

18   described, but this also represents a pattern for Mr. Koeckeritz.

19        We've had an opportunity to speak with Mr. Koeckeritz's

20   ex-girlfriend, his ex-wife, and a girlfriend from his -- when he

21   was around 15 or 16.  Many of these women were identified by the

22   fact that their IDs and -- were found during the search warrant

23   at the house, and there were sort of wellness calls that were

24   made to them.

25        So I -- just starting with the -- the most recent

ex-girlfriend.  She -- she dated Mr. Koeckeritz for two years
just prior to meeting Jane Doe 1.  They met on a dating site --
on "Meet Me" -- and she reported being repeatedly and physically
humiliated and punished by the defendant, including forcing her
into handcuffs on numerous occasions.

She reported being regularly raped by the defendant and told
that, quote, "happy couples have sex," and that he forced her to
go to dates with other men on at least four occasions and have
unprotected sex with them and instructed her not to clean herself
before she'd have sex -- before -- not to clean herself; come
home, and then he would immediately have sex with her after that.
Found at the defendant's house was her instruction -- her
instructional driving permit, a credit card in her name, and some
sort of health ID.

This particular ex-girlfriend -- Jane Doe reached out to her
to -- to basically have any recommendations on how to get out of
this situation with the defendant.  She had to go through -- Jane
Doe -- I apologize for the impreciseness -- Jane Doe had to go
through a third party to get in contact with this ex-girlfriend
because the ex-girlfriend had blocked Jane Doe on everything on
social media because she was scared that Jane Doe's social-media
accounts were going to be used by the defendant to get in contact
with her.

The -- the ex-wife -- she and the defendant were married
from 2013 to 2016.  She reported being isolated from her family

and manipulated -- and manipulated into trying to get her to

escort her for money.  The defendant threatened to kill her dog

by injecting it with insulin to maintain control over her.  He

tracked her phone, using hidden applications -- phone

applications -- reading all of her messaging -- messages and

isolated her from her family.  Found at the defendant's house

during the execution of the search-and-seizure warrant was a

government-issued ID card.

Finally, the ex-girlfriend from when the defendant was

roughly 15 or 16 -- an ID with a lock of hair was found -- the

lock of hair presumably belonging to the woman because it was

with the ID; and so when police contacted her, she said, "Oh,

it's -- he still has that?  That's so creepy" -- seeming to

indicate that the lock of hair was hers.

They dated for about two years.  They ran away together.

She reported that he was physically abusive and tried to get her

to engage in commercial sex when they ended up out at a -- at a

fare with -- with no money; and at that point, she just found a

police officer, reported herself as a runaway, and that was the

end of that.

THE COURT:  And I'm sorry.  Just to put this in the

timeframe -- this was back when Mr. Koeckeritz was -- was 14 or

15?

MR. KUPERSTEIN:  Around 15 or 16.

THE COURT:  Okay.  And he's 29 now.  So it would have been

1    about 15 years ago --

2         MR. KUPERSTEIN:  Yes, Your Honor.

3         THE COURT:  -- or 14 years ago?

4         MR. KUPERSTEIN:  Correct.

5         THE COURT:  Okay.

6         MR. KUPERSTEIN:  So, Your Honor, the point of this -- I

7    mean, as the statute provides -- past conduct or other conduct is

8    to be considered by the Court as well.  The point of this is to

9    show that this is a repeated cycle of intimate-partner violence.

10   The defendant -- whether it's a girlfriend, a wife -- whether

11   it's a younger family member, the defendant positions himself as

12   a person of a -- of trust and -- or, you know, as some sort of

13   intimate relation and uses violence and threats of violence

14   and -- and other forms of abuse to coerce or manipulate these

15   women into hopefully doing some sort of sexual act, oftentimes

16   for money.  Obviously, there are differences in the, you know,

17   the sort of patterns to an extent, but I would submit to the

18   Court that that is an evolving pattern that has continued for a

19   good portion of the past 15 years.

20        So, Your Honor, to the extent that I have reviewed the

21   transcripts, I would submit that the transcripts are just a very

22   small slice of what the government would be -- were that

23   converted into testimony, that would be a very small slice of

24   what the government considers to be as evidence.

25        I know the Court has indicated that the seeing sort of

1     understood what the allegations are regarding the finances;

2     but -- to the extent that we're talking about the strength of

3     evidence in this case.

4          THE COURT:  Sure.  Well, and let's travel down that path

5     just a bit because one of the exhibits that Mr. Bugni put in was

6     the fact that Jane Doe apparently did have some access to some

7     money.  Apparently she was going to a corral, and I infer doing

8     some horse riding.

9          The inference that I think Mr. Bugni wants the Court to draw

10    is that Jane Doe wasn't as financially constrained as -- as the

11    government now is claiming.  How would you respond to that?

12         MR. KUPERSTEIN:  I would respond to it in a few ways.

13    First, we do have -- we do have a text message -- or a Facebook

14    message conversation between Mr. Koeckeritz and Jane Doe 1 that

15    sort of addresses this.  We do have extra copies, if the Court

16    wants them.  If not, I can just read -- read it.

17         THE COURT:  Does -- does the defense have them?

18         MR. KUPERSTEIN:  We provided them this morning because this

19    was -- this -- it is directly responsive to what is written in

20    the motion.

21         THE COURT:  Okay.  I would want you to put them into the

22    record before we close, but I don't need to have it in front of

23    me right now.

24         MR. KUPERSTEIN:  Yes, Your Honor.

25         So, Mr. Koeckeritz messages:  "I've reminded you to post to

1  Insta for the last three days straight --" "Insta" being

2  "Instagram" "-- and you acted like you were doing stuff on the

3  phone right after each time.  You're supposed to be posting

4  daily."

5      Jane Doe:  "Yeah, I need some new pics, but I can do that

6  Monday."

7      Mr. Koeckeritz:  "The only reason we can write off the horse

8  lesson is as a photo shoot.  Supposed to have been getting pics

9  each time, and not posting to Insta daily is a huge wasted

10  opportunity.  IDK --" meaning "I don't know" "-- how I can be any

11  clearer with you.  It isn't optional.  It needs to be done so

12  that you succeed.

13      So -- and then continuing -- "OF and Insta needs to be a

14  post ever day without any exception.  Should be the first thing

15  you do every day."  "OF" being "Only Fans," which is another

16  streaming platform.  "Seven days a week -- even on Mondays and

17  holidays."

18      Jane Doe responds:  "Just need to do festive pics."

19      Mr. Koeckeritz:  "Well, you've been horrible with Insta, and

20  I feel backstabbed and lied to because I was being helpful, and

21  there have been so many occasions now that you acted like you

22  posed after I'd reminded you, when, in reality, you were being

23  deceptive.  Spent over 3K on a camera to help -- help you, and

24  even you promised that you would -- you --" there's an arrow in

25  the way -- something "on top of it."

1      So, Your Honor, we have the final four streams that --

2  from -- from the Chaturbate platform that were reported.

3  Chaturbate doesn't retain all of these eight-hour-long streams.

4  It's a rolling sort of deletion process.  By the time we got our

5  preservation request, we got the last four streams.

6      A pretty consistent theme in those as well as the -- as well

7  as the -- what Jane Doe reported -- was a sort of, like, a cowboy

8  theme.  She'd wear sort of these Daisy Duke shorts and sometimes,

9  like, a -- like a cowboy-hat-type thing.  That was a theme.  And

10 so a lot of these -- the purpose of this horse riding primarily

11 was to take pictures on Instagram.  That would be used to

12 advertise her streaming platforms.

13     So that was, from Mr. Koeckeritz's perspective, the -- the

14 purpose of these horse-riding lessons, and, you know, quite

15 frankly, she reported -- "she" being Jane Doe -- that, you know,

16 the -- the horse lessons to the extent that she was able to

17 participate in them were the only things that sort of kept her

18 sane during this period.

19     You know, to the extent that she was given any sort of

20 ability to write out a check for anything -- this was all done

21 under supervision.  There were some credit cards in her name.

22 There were some other things in her name.  But as the

23 financials -- financials show and as Jane Doe reports, she really

24 wasn't in control of the financials.  There was an appearance

25 that was intentionally crafted to show that -- to make it seem

1    that -- that Jane Doe had control of her financials, but it

2    really wasn't the case.

3         THE COURT:  And let me interrupt.  I know we're very early,

4    and I don't think the Rule 16 has gone out yet, but has the

5    defense team seen any of the financial information yet or not?

6         MR. KUPERSTEIN:  We -- to the -- there are a couple of

7    financial documents.  Basically, I wanted to be able to walk the

8    Court from Point A to Point B in terms of how the money gets from

9    the streaming site into an account that's exclusively controlled

10   by the defendant.

11        THE COURT:  Well, that was all in the search warrant

12   affidavits and the forfeiture warrants, wasn't it?

13        MR. KUPERSTEIN:  I don't know whether the specific --

14   whether the specific documents were --

15        THE COURT:  Well, the documents were not attached, but your

16   agent -- your affiant spelled it all out for me.  So I get it;

17   but if you want to rely on it today, then defense needs to hear

18   it.

19        MR. KUPERSTEIN:  And I provided those to the --

20        THE COURT:  Okay.

21        MR. KUPERSTEIN:  We provided those to the defense, yes.

22        MR. BUGNI:  Sorry.  When we say "these," what are we talking

23   about?  We got a bunch of documents that we don't understand what

24   they mean; it just says "Bremer Bank" and has a bunch of numbers

25   on it and "Saint Paul Federal"; but as far as what an affidavit

1  and a search warrant or a forfeiture would provide -- that has

2  not been given to us.

3      MR. KUPERSTEIN:  And that's not --

4      THE COURT:  Which is not what Mr. Kuperstein is claiming;

5  but to the extent that -- that it matters to the government in

6  terms of the Court's detention decision, I certainly don't want

7  the defense to feel like it's been sandbagged here.

8      So, Mr. Bugni, let me suggest this -- let's get the

9  government's entire proffer, then I'll let you go; and if you

10  think you need more time to -- to look at documents and get back

11  to the Court, I'll give it to you; but if you're comfortable

12  continuing now, let's -- let's keep going.

13      MR. BUGNI:  Let's keep going.

14      THE COURT:  All right.  Back to the government.

15      MS. KRAUS:  Your Honor, I should note that the defense

16  letter did spell out some of the financial arrangements here.

17  That leads me to believe they did have access to the State file

18  that would have contained some of these documents.  I don't know

19  how else they would have represented some of that information;

20  for example -- that Jane Doe reportedly had 40 percent interest

21  in this company.

22      THE COURT:  Well, and -- and let -- let me be clear:  I'm

23  going to let everybody have as much time and as much input to the

24  Court as they want, but a release or detention decision is not

25  going to be based on who controlled the bank accounts.

1    I mean, yes, that's part of it, but there's a lot more going

2    on here that's a lot more concerning to the Court than -- than

3    where the money went.  So, yes, it's part of the picture, but

4    it's a smaller part of the picture than all of these other

5    allegations of mental and physical control and abuse, which

6    are -- are very concerning to the Court, but --

7    MR. KUPERSTEIN:  And, Your Honor --

8    THE COURT:  -- we're just in the middle.  So let's keep

9    going.

10   MR. KUPERSTEIN:  And, Your Honor, I'm talking about it to

11   the extent that the Court asked about the -- sort of the horse

12   lessons.  If -- if the Court is -- if the Court doesn't want us

13   to spend any more time on it, I -- I can move on.

14   THE COURT:  And, Mr. Kuperstein, I -- I'm not trying to tell

15   you what you should or should not do.  I want to hear everything

16   that the government thinks the Court needs to know.

17   What I'm trying to convey is that, yes, the finances matter,

18   but -- but they're in the -- they're secondary to a lot of the

19   other things you've already proffered.  The other part of it is I

20   don't want Mr. Bugni or Ms. Blair to feel like they've been

21   sandbagged at this hearing with information you want the Court to

22   rely on that they haven't had a chance to counter, and -- and I'm

23   going to let Mr. Bugni tell me whether that's true or not.

24   So to the extent that you want to tell me more about the

25   finances so the record of this hearing is self-contained, please

1    do so.

2         MR. KUPERSTEIN:   Thank you, Your Honor.

3         And I can show defense counsel what document it is that I'm

4    referring to here.  But the first document that I'm referring to

5    is a -- is a -- this is actually -- it says on the top "field and

6    value," and what it provides is -- a payment made from -- a

7    payment made from the Chaturbate platform.

8         This is from Chat- -- returns from Chaturbate, and it

9    provides that there is a payment amount in the amount of

10   $6,739.75.  It's made to Jane Doe -- obviously, her name is -- we

11   have the original document, but it was redacted -- and the tax

12   name's the Boring Company.

13        There's a date at the bottom of April 20th, 2021.  That's

14   not the date of the transaction.  The way that we know the date

15   of the transaction is the name of the file, and the name of the

16   file shows that it's in -- in July of 2021.

17        And so that amount -- $6,739.75 -- that was placed in the

18   Bremmer Bank account, and we know that because that -- that's all

19   contained in the Chaturbate payment information.

20        So that ends up appearing in the Bremer Bank account for the

21   Boring Company in the amount of -- same amount -- $6,739.75 on

22   July 6th, 2021, and that -- later that month, two days later,

23   there's a -- or one day later -- there's a withdrawal from the

24   Bremer Bank account to Boring Company payroll.  And we've

25   discovered that the -- and the withdrawal from Boring Company

1    payroll was $4,311.18 in this particular incidence.  It typically

2    was around that amount -- every two weeks, roughly that amount

3    was withdrawn.

4        So we learned that this money then goes to a

5    payroll-processing company that splits the $4,311.18 into two

6    paychecks.  One of those paychecks is for the defendant, and one

7    of those paychecks is for -- for Jane Doe, and it's roughly split

8    in half 2,156 versus 2,155.

9        So then, those two paychecks get deposited into Saint Paul

10   Federal Credit Union into an account that was exclusively

11   controlled by the defendant, and we have on -- on July 8th, 2021,

12   Boring Company payroll -- both paychecks separately get deposited

13   on that day into an account that belonged exclusively to the

14   defendant.  So that's just sort of one example of sort of Point A

15   to Point B to Point C of how -- how we submit to the Court that

16   the finances were exclusively controlled by the defendant, and

17   that is to say that to the extent that there's this argument that

18   the defendant gave Jane Doe more freedom because he allowed her

19   to control finances is simply not borne out by the evidence that

20   we have.

21       Oh, and -- thank you -- we would also note that during the

22   execution of the search-and-seizure warrants, the credit cards

23   that are in her name -- in Jane Doe's name were found in the

24   defendant's house in his car.

25       So turning to the -- if I can go to your third question,

1    Your Honor -- is the alleged victim in a safe place.  That's a

2    difficult question to answer, Your Honor.  I believe that Jane

3    Doe is hopefully in a place where she's physically safe.

4        I, you know, to the -- I would say she's in a place where,

5    on a day-to-day basis, she -- as that home is right now, I think

6    she's in a safe place; however, the defendant has shown himself

7    to be extremely sophisticated in the use of technology to contact

8    and exploit and manipulate people and damage them.  He -- we have

9    evidence that he is -- has a facility with virtual private

10   networks which are used to sort of mask your activity -- your

11   technological activity as you use the internet.

12       He has -- he uses email generators and password generators

13   to create many different types of accounts for -- for different

14   purposes -- multiple people have reported this to us.  You know,

15   he -- he has repeatedly and consistently used social media to

16   reach out to -- to reach out to these women and pray on them.

17       So -- and also we --

18       THE COURT:  Let -- I'm sorry for interrupting -- but let's

19   travel down that path a bit further.  When you say "reach out to

20   these women" -- were you planning on going there?  In other

21   words, who are we talking about in terms of preying on these

22   women?

23       MR. KUPERSTEIN:  Specifically, Your Honor, we would say Jane

24   Doe certainly is an example of it as well as the most recent

25   girlfriend, who he -- who he sought via a dating site on "Meet

1      Me."  The -- the -- Jane Doe also reports the defendant opening

2      credit cards in her name, the fact that the defendant is in

3      possession of her social security number, was able to completely

4      access and manipulate her social-media accounts.  There's also --

5      we are also acutely aware, and it is a fear of -- of Jane Doe,

6      that -- that material -- that the defendant could be in

7      possession of -- that's stored in -- in the cloud is something

8      that -- that could be released and would be extremely harmful to

9      her.

10          So -- so aside from the fact that we believe the defendant

11     to be extremely violent and manipulative, there is sort of a -- a

12     technological aspect to the danger that he poses to Jane Doe and

13     others that no -- no level -- in our view, no level of monitoring

14     of his sort of internet usage is going to completely ensure

15     that -- that -- that they are safe.  So -- so that -- that is how

16     I would address whether the -- whether Jane Doe is in a safe

17     place.

18          And, Your Honor, just turning back to other conduct.  The

19     defendant was previously arrested and convicted with a charge

20     relating to impersonating a police officer in Minnesota.  I

21     provided the police report to -- to defense.  I should note that

22     this conviction was expunged, but it is past activity that we

23     feel is relevant.

24          So police -- just to read the final summary here at the

25     end -- so the actual arrest occurred in September of 2015; but in

1    a final summary here, beginning in November -- of November of

2    2014:  "Koeckeritz has made efforts to represent himself as a law

3    enforcement -- as law enforcement or as a police officer.  He has

4    purchased vehicles, equipment, and behaved in a manner that would

5    leave people to believe that he is a police officer.

6        "Koeckeritz has been seen driving two vehicles that give the

7    appearance of police squads and are uniquely equipped with cages,

8    radios, switches, cameras, computers and markings.  These

9    behaviors have drawn significant attention to Koeckeritz in the

10   forms of complaints from citizens as well as federal and local

11   law enforcement.

12       "On multiple occasions, Koeckeritz has been observed in

13   Saint Louis Park in a black-and-white Chevrolet Impala in Saint

14   Louis Park.  A dash cam located inside of that vehicle also

15   showed him on several dates, parked -- it says "darking out

16   behind businesses --" "a business" -- I don't know whether that's

17   supposed to be "darting" or "parking" "-- out behind business and

18   sounding his air horn at motorists.  Coupled with these behaviors

19   and his own admission that his vehicle looks like a police squad

20   to the public, I am requesting that a copy of this report be

21   forwarded to the Saint Louis city attorney charging him."

22       So it wasn't just the one incident.  It was repeated

23   incidents that led them to finally charge and arrest him with

24   regard to this.

25       This behavior has not stopped.  The ex-girlfriend -- the

most recent ex-girlfriend right before Jane Doe reported that
Koeckeritz gave the impression that he was some sort of law
enforcement before she learned that he owned his own sort of,
like, security company and that when -- the first time that they
met, he showed up in a full sort of gear -- tactical gear with
a -- with a holster on his side, looking very much like a police
officer.

During the search warrants that were executed at the various
properties in this case, police recovered several pepper --
pepper-spray cans marked "for law enforcement use only."  They
also located a -- a replica marshal -- U.S. Marshal badge that
had one of those warning strips over the -- that obscured the
fact that it was a -- bore the logo for his -- for his security
company, Cuff LLC.  So because of the warning strip -- if Your
Honor is familiar with those -- they work -- it wasn't visible
that this wasn't an authentic sort of -- sort of item.

So this is, in the government's view, a very disturbing
pattern of conduct where he continues to represent himself as
sort of a police officer and -- and not -- and not do anything to
correct that impression with other individuals.  And so it goes
to sort of the deceptive and manipulative nature that is very
disturbing to the government and suggests that he is a danger to
the public.

With regard to the three release plans and why none of them
would suffice -- I'll begin with releasing him -- releasing the

1    defendant to the -- to the Seventh Street, South Hudson address

2    with his -- with his mother and stepfather.  When police executed

3    a search-and-seizure warrant at -- at that property, they

4    recovered a safe that had been buried in the garage.  And when

5    they -- when police arrived, the safe had been dug up.

6         Neither the mother or the stepfather could tell police where

7    the safe came from, how long it had been there.  The mother

8    indicated that -- that Mr. Koeckeritz had --

9         I apologize, Your Honor.  I just want to make sure I'm

10   getting this right.

11              (Discussion held off the record at 11:21 AM.)

12        MR. KUPERSTEIN:  Sure.  Sure.  Please.

13        MS. KRAUS:  I'll continue with this, Your Honor.  The safe

14   in the garage had been unburied.

15        THE COURT:  By whom?

16        MS. KRAUS:  It was unclear.  The father and -- the

17   stepfather and the mother couldn't provide any information about

18   this safe.

19        When it was forced open, it contained a gun.  The

20   stepfather's reaction to this gun was "I have purchased so many

21   guns; I don't know if -- where this came from" -- something to

22   that effect.  Neither the feather -- father -- stepfather or the

23   mother had represented they knew where this gun had come from.

24   It was essentially a complete mystery as to why this gun was in a

25   safe that had been presumably buried in their backyard.

1       Officers also located a second safe in the basement.  That

2   safe, according to the defendant's mother, belonged to the

3   defendant.  She represented that he had called her and told her

4   "everything in that safe now belongs to you," but the mother was

5   completely unaware of its contents.  However, it was able to be

6   opened because the defendant had provided her a code.

7       In that safe was an additional AK -- some sort of assault

8   rifle.  This was a ghost gun, meaning it was untraceable in terms

9   of how it had been made, how it had been purchased.  There was no

10  serial number on this.  So it's unclear if this is a gun that the

11  defendant had assembled, purchased, or perhaps even 3-D-printed

12  himself.

13      There was also a trigger device in an envelope bearing the

14  name of his ex-girlfriend.  That trigger device, from my

15  understanding with the conversation with police, is a device that

16  allows actual mechanical operation of a gun, meaning this device

17  is something that's used to -- to then allow the gun to function.

18  There was also a prescription pill bottle bearing the defendant's

19  name.  So any inference that this did not belong to the defendant

20  is just completely just obfuscated by this evidence and the fact

21  that upon seeing the contents of the safe, the defendant's mother

22  expressed she had never seen this before.

23      And so to the extent that there's a concern that

24  Mr. Koeckeritz has a number of firearms out there -- I think this

25  all supports that theory -- that while 14 firearms had been

1   recovered from him -- his home, there is no guarantee that any

2   firearm associated with him -- all of them -- have been

3   recovered.  And this is, you know, again true, where in the

4   mother's house, we have these two safes containing guns that

5   apparently no one knew anything about.

6       You know, I would note that both the stepfather and mother

7   represented they owned several firearms themselves.  I think that

8   does pose a concern here.  While they may be, you know, willing

9   to get rid of the guns or at least lock them -- that potentially

10  that the defendant would have access.  And, again, I don't know

11  that there's any guarantee that we can say all the guns here have

12  been recovered.  I think that's particularly true when we

13  consider the fact that the defendant was known to be a

14  daily-carrying, you know, gun owner, admitted that to police and

15  yet, his daily carry was missing at the time of his arrest.  It

16  was not located during the search of the house; although, the box

17  was.

18      Officers specifically searched the defendant's mother's

19  residence for that gun.  It was not located.  It was only

20  provided to River Falls Police Department several months later in

21  mid-January of this year because somehow, this -- his defense

22  attorney had it and then provided it without explanation to the

23  River Falls Police Department.

24      So I think that all kind of really lends itself here that

25  it's unclear whether all the firearms have been -- have been

1    located.  I should also note that with respect to the other

2    property that Mr. Koeckeritz is planning -- proposing release --

3    that's been characterized as a "family lake home."  During the

4    search warrant of that house, officers did find an empty gun case

5    as well as holsters.

6        I don't know if you want to jump in here, but --

7        THE COURT:  Let me interrupt before you move on.  I want to

8    back up to the firearm in the safe in the basement.  I want to

9    make sure I'm tracking.  What I heard you say was that it was a

10   firearm with no serial number, and that implies that it was

11   assembled by somebody.  You think by Mr. Koeckeritz?

12       MS. KRAUS:  We don't know who -- to whom it -- you know,

13   because it's impossible to tell.  It's an untraceable gun.

14       THE COURT:  Understood.  And -- and educate me -- or remind

15   me.  A firearm -- a functioning firearm with no serial number is

16   unlawful?

17       MS. KRAUS:  That's right.

18       THE COURT:  Okay.  That -- those answer my questions.  Back

19   to you.

20       MR. KUPERSTEIN:  Just to -- just to add with regard to the

21   mother and stepfather's house -- the stepfather, during the

22   execution of the search-and-seizure warrant at their house -- the

23   stepfather was asked about the safe that was located in the

24   garage that had been dug up from somewhere; and the stepfather

25   was able to say there's a firearm located inside of the safe.

1    The safe had been buried.  He didn't know -- the stepfather

2    didn't know where the safe had been buried, and that the -- but

3    knew that the safe had been in the garage for more than a year.

4         So there was a safe in the garage for more than a year that

5    had been buried -- you know, had previously been buried, but

6    he -- and he knew that there was a gun in there, but he didn't

7    know what type of gun was inside of there, and he didn't have a

8    key for it; but he suggested, as my cocounsel said, that he had

9    owned so many guns, that he's not sure who would have purchased

10   the one that was inside the safe, but he knew that the safe and

11   the gun were not the defendant's.  Okay?

12        So -- it sort of seems logically inconsistent from the

13   gov- -- government's perspective.  I know that there's a gun in

14   there.  I know that this has been in the garage for more than a

15   year.  I don't know what kind of gun is in there, and I know that

16   it's not the defendant's.  But so either the stepfather is, to

17   some extent, understandably, trying to cover for his stepson, or

18   he doesn't know what guns are where, and he doesn't have a key to

19   the safe; so he doesn't know where the key is.

20        So either they're not responsible gun owners or there's some

21   element of deception here, some element of obfuscating here.  So

22   that -- that was very disturbing to the government, and that's --

23   with -- along with the other reasons not -- from our perspective,

24   not an appropriate place for him to stay.

25        MS. KRAUS:  So with respect, then, to the lake house

residence -- we have addressed our concerns with that.  I think

it's noted in the pretrial report that no one else lives there.

Mr. Koeckeritz would essentially be alone at that residence.  For

the reasons addressed in the Pretrial Services report, we don't

think that's an appropriate location.

You know, I think part of this as well is that, you know,

the evidence here is that Mr. Koeckeritz purchased that house,

that this is not some sort of property that's been in the family

for years, but rather he used the proceeds of the forced labor to

place a down payment on this home.  So I think in part, you know,

to say that this is a family vacation home -- I don't think

that's accurate.

With respect to the --

THE COURT:  Wait.  Stop.  Stop.  I'm looking at Mr. Sutor's

report, in -- in which the report is that the -- it's a family

cabin owned by the defendant's mother in New Richmond.  What

you're telling me is that Mr. Koeckeritz used money from the --

the webcam accounts and -- and put the down payment on it.  Do

you know is the house in his mother's name, or you --

MS. KRAUS:  It is.

THE COURT:  Okay.  But --

MS. KRAUS:  He --

THE COURT:  But he paid for it?

MS. KRAUS:  Yes, the evidence here is that a 30,000 down

payment was drafted in the form of a check from his business

account, the account that received all of the deposits from the
streaming of which he was the sole authorized signer.  So that I
think is a mischaracterization that this, again, is some sort of
family cabin.  Although it is certainly entitled -- titled to the
mother at this point -- and, again, I noted that there was the
gun case empty and holsters in that home.

THE COURT:  I think Ms. Pfluger wants a word.  And just so
everyone knows:  When the government is done, we're going to take
a ten-minute break or longer, if you want it, but everyone's
going to get at least a comfort break, more time if necessary,
but let's finish the government's presentation.

MS. KRAUS:  And to that end as well, Your Honor -- that this
home was initially purchased for the purpose of, you know, a
residence for the defendant and to be used as a residence where
the victim would continue to stream; but due to some -- the fact
that it didn't have high enough internet speed, it was then
provided to his mother.

So -- so I would note, again, that while it's in his
mother's name, it's our representation here that this was, in
fact, purchased by him.

With respect to the last place -- that is Ms. Davidson's
home -- she is Mr. Koeckeritz's grandmother.  You know, I would
note that according to our River Falls partners who are quite
familiar with this area -- this is within a number of blocks from
the defendant's mother's home.

1    Ms. Davidson does not, by our view, have a criminal history;

2    however, you know, we were able to see that she was charged in

3    Minnesota in 1976 with a forgery that was dismissed.  She was

4    then, you know, arrested -- unclear if this resulted in

5    convictions or prosecutions, but that she was at least arrested

6    in Florida in 1970 for burglary and then a separate arrest for

7    interstate transportation of a stolen vehicle, knowing the same

8    to have been stolen, and then in Utah in 1969 for petite larceny.

9    I understand that's dated; but I think, you know, again, we do

10   have at least some evidence here to suggest that Ms. Davidson, in

11   the past, has been untruthful.

12       There's also been a call which Ms. Davidson placed to the

13   defendant while he was in custody, indicating that she really

14   wanted a gun and asking the defendant for advise -- specifically

15   whether she could purchase the gun before applying for a permit.

16   So while we don't have evidence at this point that Ms. Davidson

17   has firearms, I think certainly the fact that she had expressed

18   an interest in guns in a recorded jail call in October of last

19   year should give us some pause here; but, again, there is no

20   guarantee that Mr. Koeckeritz -- he won't have access to

21   firearms, which, as my cocounsel's already elaborated on, was

22   part of the threats of force in this case -- part of the

23   manipulation, part of this climate of fear, and certainly, he's

24   represented in the past to be some sort of authority figure.

25       And, you know, I think it's also just important to note -- I

1    know you've read the search warrants, Judge -- but there were 14

2    firearms located in his home.  It was an arsenal -- upwards of

3    20,000 rounds of ammunition, tactical vests, hallow-point

4    bullets, pepper spray labeled with "law enforcement use only,"

5    military uniforms, military badges, police badges, police

6    uniforms.  And while Mr. Koeckeritz might have been discharged

7    from the army between 2012 and 2013, we have no record that he

8    served in the military beyond that.

9         I would also note that these guns -- three of them at least

10   were loaded with rounds in the chamber, one gun was found in the

11   kitchen.  Again, round in the chamber ready to go if needed.  I

12   think the fact that all of this taken together -- his access to

13   firearms -- should give this court great pause.

14        THE COURT:  Just confirming what -- what Mr. Bugni pointed

15   out -- he's not a prohibited person, and as I think everyone in

16   the room understands, it's normal in Wisconsin.  I mean, people

17   have guns.  But I understand your point, which is a little bit

18   different.

19        That said, I interrupted.  Please continue.

20        MR. KUPERSTEIN:  Thank you, Your Honor.  And that's exactly

21   right -- people absolutely have guns.  It's the context in which

22   some of these events have transpired that give us pause --

23   particularly with this defendant.

24        Your Honor, ultimately, this boils down to the government

25   believes sincerely that the defendant is an extremely violent and

1    manipulative person, that there is nothing -- there's no

2    condition of confinement that is going to dissuade him from --

3    from continuing to -- to bring harm -- whether it's -- whether

4    it's trying to do something over the internet or physically

5    harming somebody, and this pattern of conduct -- this outrageous

6    pattern of conduct -- has continued over the course of several

7    years.  So -- so that's our position.

8         MS. KRAUS:  That's our position, Judge.  And I think we do

9    want to end it by reading into the record the statement provided

10   by Jane Doe.  I believe -- you know, I don't know that she's

11   still in the courtroom, but certainly she was here, and she did

12   ask us to read this, so.  It is lengthy, but I will try to --

13        THE COURT:  Has it been provided before now to defense?

14        MR. BUGNI:  No.

15        MS. KRAUS:  It's -- it's not been --

16        THE COURT:  This is new --

17        MS. KRAUS:  -- provided.

18        THE COURT:  -- to you?

19        MR. BUGNI:  Yes.

20        THE COURT:  Let's continue.

21        MS. KRAUS:  Okay.  So this was prepared by Jane Doe.  These

22   are her words.  So if there's errors, I'm going to keep them true

23   to the writing.

24        "I'm against Austin Koeckeritz getting out of jail.  If he

25   were to get out, I know for a fact that he will just do what he

has been doing with me and other girls before me; and even if he won't be allowed to have access to the internet, he will find loopholes to exploit or traffic the next woman. He will be fully capable of manipulating and getting anyone to do as he pleases as well, since he has a degree in psychology and knows how to use it to his advantage.

"Austin really knows his way to work around someone's mind; and once he finds a good target, he'll use her to his advantage. Not to mention that Austin has previously stated that he wants his sex business to expand by looking for more girls to do work for him, just to make him an income against their will. No woman ever deserved to be a victim of his manipulation and abuse for his own entertainment and finances.

"If Austin were to get out of jail, I would fear for my very own safety along with those related to me. Austin has made it clear as possible for the entire time I have known him that he does have power over me and used it to his advantage.

"From the time I lived with him, he has chased me around his house twice with fully loaded guns, and telling me for one of them, 'If I shoot with this, I can leave a big hole in your body.' While he claims he has no memory of these events ever happening because of him being on Ambien, I fear what he would do to me if he gets out of jail. I fear that he will seek me out and try to cause harm for me or hire someone on the dark web, such as a hit, to go after me and end for me -- and end me for

1    him, as Austin very well knows his way around the dark web.

2        "I feel that Austin will just seek out a way to get back at

3    me because I am the person who finally got him caught when all

4    these years, he thought he was sly and could get away with so

5    much in the past without getting caught by police.  Again, I will

6    100 percent fear for my life and safety if he were to get out of

7    jail.

8        "If he is al- -- if he also were to get out, the public will

9    not be safe.  He has told me a couple stories where he had to

10   pull his gun out on people, and he wouldn't be afraid to shoot

11   them.

12       "In his own words to me, 'a human body is just a vehicle --

13   once someone dies, there are nothing -- they are nothing; they

14   really had no importance in this world.'

15       "He may have his conceal-carry permit taken away, but Austin

16   knows very well how to buy a gun and where to hide it from the

17   cops.  When he was in jail for the longest time, he wouldn't give

18   up the location of personal conceal-carry gun for the longest

19   time, and that just makes me wonder if he has more that he has

20   hiding from everyone that he can get access to.

21       "Austin is a very violent person with zero sympathy -- not

22   even for the life of a human being -- young or old.  He simply

23   does not care to even harm someone unless it would benefit him.

24       "I know I mentioned in the last paragraph Austin has no

25   sympathy for anyone young or old.  When I say it, I mean people

1    as young as children.

2         "For starters, Austin has a sister who, at the time, was 15

3    years old, and he managed to get her tied up in his sex-business

4    industry.  Without even caring that she was his own blood and

5    underage, he had her pose in nude pictures.

6         "On top of that, he had her do explicit TikToks to promote

7    streaming in a fur suit, that he has had her call a

8    'Murrsuit' --" in parentheses "-- a Murrsuit is what adult

9    furries use for sexual activity in costume --" end

10   parentheses "-- if she didn't keep up with posting suggestive

11   videos online, he would get visibly angry with her.

12        "Not his sister, though, is of concern.  There has been

13   times when Austin would be on the dark web, watching child

14   pornography.  There even was a moment he was showing me pictures

15   and videos of kids having intercourse with other kids or adults

16   raping children and infants.  Some were alive, screaming, and

17   others seem lifeless and dead.  And each one that he would watch,

18   he would laugh hysterically and seem overly excited about what he

19   was watching on the screen.

20        "As well, Austin has told me that one reason why he was

21   attracted to me was because I look underage or look like

22   jailbait.  In his words, quote, 'That's what everyone likes

23   nowadays -- young people and young-looking people,' end quote.

24   And if these are the way he reacts around seeing children, it

25   clearly shows he does not care about them unless they benefit

1    him.

2        "Austin used to run a discord server that has kids as young

3    as 13 in there.  There would be multiple days where Austin would

4    get super suggestive and make sexual remarks towards the minors

5    in a group chat.  I even brought it up to him that the way he's

6    acting is very inappropriate and not the way an adult should be

7    interacting with kids.  He replied that it was his server and he

8    is free to act as he pleased and stated that kids were enjoying

9    his behavior.

10       "I also know that if Austin was able to get out on bond, he

11   will 100 percent know how to get around the agreements he will be

12   giving.  Austin is a very smart person and knows how to use

13   everything he has knowledge in.  If he were to get a tracker

14   placed on him, he is tech-savvy enough to know how to get it off

15   and/or disassemble it without giving any alerts or notices.

16       "He very much will be a flight risk as well.  When he has

17   different charges for theft of property, he very much did

18   everything in his power to avoid going to court when I lived with

19   him.  The only reason why he was able to make it to that one was

20   because he wasn't in jail.

21       "And, again, Austin knows his way around the dark web and

22   knows how to make transactions without them being traced.  With

23   that being said, he could very easily purchase a fake ID and

24   flee, purchase weapons and even hire someone to be a replacement

25   for him while he goes back to what he did before he was in jail."

1    THE COURT:  Thank you.  Do you have a copy of that that you

2    can give to Mr. Bugni and Ms. Blair for them to read over the

3    break?  I see passing between the tables.

4    MR. KUPERSTEIN:  Yes, Your Honor.  That's what I passed.

5    THE COURT:  Okay.  So is that it for the government?

6    MR. KUPERSTEIN:  Yes.

7    THE COURT:  Okay.  Let's take -- is ten minutes enough?

8    MR. BUGNI:  Yeah.

9    THE COURT:  Okay.  Let's reconvene in ten minutes, and we'll

10   hear from the defense.

11   MR. BUGNI:  Thanks.

12   THE CLERK:  This Court is in recess.

13          (Recess taken from 11:40 AM to 11:55 AM.)

14   THE CLERK:  All rise.  This Honorable Court is again in

15   session.

16   THE COURT:  All right.  Please be seated.

17   Mr. Bugni, any preliminary matters before you begin?

18   MR. BUGNI:  No, Your Honor.

19   THE COURT:  All right.  The floor is yours.

20   MR. BUGNI:  Thank you.

21   You know that we're at a bit of a disadvantage.  And what we

22   had, we presented; and what we've heard today -- I think it's

23   hard to confront that -- that title wave of accusations; right?

24   But --

25   THE COURT:  And let -- as I made clear at the beginning --

1     and I can infer what you're going to tell me in response to what

2     I'm about to say -- if you wanted more time to digest what the

3     government told you, I can adjourn the hearing.

4          MR. BUGNI:  And I appreciate that.  I don't think we do.  I

5     think that the -- I don't think I need more time partly because,

6     as this court knows, *Dominguez* controls.  You know, like -- like

7     dangerousness of the past or of this conduct -- you actually have

8     to show that it's going to be dangerousness on supervision.  What

9     is it that portends that this man is such a danger that he cannot

10    be let out?

11         And what we've heard is a lot of kinkshaming, and it's a lot

12    of saying, "We're uncomfortable with this."  And I'm

13    uncomfortable with it.  You know, I don't like the idea of people

14    getting dressed up or all of these things, but it's a different

15    reality.  It's adults engaged in adult behavior that's protected,

16    and there is nothing here that says the product of that was

17    coerced, that it was violence that was coercing that.

18         It's -- maybe he's manipulative; maybe he's gaslighting,

19    maybe he's many terrible things, but that doesn't say you can't

20    be released.  What says you can't be released is that you're a

21    violent person writ large, that you're a violent person in such a

22    degree that we have to fear for the community's safety.  And when

23    you frame it in that terms -- and the terms that the Bail Reform

24    Act actually demands -- then you can parse all of the

25    allegations.  The allegations fall on the side of it's

1    disgusting, and maybe -- maybe some of it's true.  Mr. Koeckeritz

2    denies almost all of it.

3        But that which is true is always kind of given this halo of

4    like it should make you uncomfortable -- it should make you

5    uncomfortable that there was a furry suit; it should make you

6    uncomfortable that there was sex with multiple partners; it

7    should make you uncomfortable -- sorry, Your Honor.  You were

8    going to say something.

9        THE COURT:  No.  I just -- I'm going to tell you the same

10   thing I told Mr. Kuperstein:  I will let you tell me anything you

11   want to; but from the Court's perspective, this isn't about

12   kinkshaming or furry suits or webcams or group sex -- it just

13   isn't.  I don't care about that.  So don't worry about that being

14   a basis for the Court to be uncomfortable and to detain your

15   client.  It's more about the allegations of how he treated Jane

16   Doe and whether, if he were to be released, he would present a

17   danger to her that the Court could not comfortably allay with

18   conditions; okay?

19       MR. BUGNI:  I'm going to address that.

20       So to that end, we don't believe Jane Doe.  We don't believe

21   Jane Doe; we don't believe these new sets of allegations; we

22   don't believe it when she comes to the police the initial time.

23   And the reason we don't is because we've given you the

24   transcripts; we've given you the pointed questions of "Well, tell

25   me about the force."  And the force is "He just really

1    manipulated me"; "He just gas-lighted me"; "He's just kind of a
2    jerk."
3         There wasn't, you know, this -- this onslaught of this is
4    such a terribly sexually violent and physically violent person --
5    that that was a product of that coercion, and that -- that is
6    what brought it about.  Instead, it's, like, you know everything
7    for the first year was fine.  The second year, you know, things
8    fell apart, and it became coercive, but it's coercive not by
9    violence.  It's coercive by him saying, Look:  You got -- if
10   you're going to write off the horse-riding lessons, you've got to
11   actually take the pictures on Instagram.  If we want our business
12   to succeed --" the business that you control 40 percent of and
13   the business that you actually have access to the funds -- we
14   take great -- I would say, "a different view" from the
15   government.
16        If you looked at Exhibit F -- part of it was the Ace
17   Riding -- the riding school.  But the real part that we wanted to
18   show the court was the apex.  There's $12,000 of checks written
19   in Jane Doe's hands.  That's a lot of money, Your Honor.  That's
20   a lot of money that she wrote out of that account.
21        And these -- much of this money was going into her
22   retirement account.  She had about $15,000 put in there -- in one
23   account; I believe 12 in another.  That's not an insubstantial
24   amount of money.  That's not that this woman is being robbed of
25   all of her wages.

1    So to take it to what -- what do we think happened.  I think

2    the government has made a lot about the minor -- the minor in

3    this case; right?  What they've left out is in the first two

4    interviews with the minor, she says that "Jane Doe is the one who

5    groomed me."  "Jane Doe should be in jail."  "Jane Doe is the one

6    who did this."  She's no fan of her brother -- half-brother --

7    but she's no fan of Doe, and she was there.

8    When it comes to the violence that -- that also that the

9    government has outlined -- when you parse through it, you say,

10   "There is the grease," which there was no evidence of.  When the

11   officers have it two days later, they say, you know, "Let's see

12   it."  There's nothing there.  The sister says, "I didn't see

13   anything"; and then she shows up for the SANE exam.  We take a

14   different view from the government, but we don't have the

15   documents in front of us.  We believe it was about ten days, but

16   we could be off.

17   Regardless, the contemporaneous evidence -- the one thing of

18   true force that there was in her first statement was the grease.

19   And the officer says, "I can't see it."  And her sister can't see

20   it.  We don't believe it happened.

21   And that really does come to the other aspects of this

22   force.  You know, like, he's so violent and he's doing all these

23   things.  Even in Doe's letter to the Court today, she says "He

24   chased me around the house twice with a gun."  "Both times, he

25   was on Ambien."

1    Now, she says it only happened once in her interviews, but,

2    like, okay.  That did -- if that did happen and he's asked about

3    it in his interviews and says, "I don't recall that."  "I was on

4    Ambien, but I don't recall that" -- well, that -- that's not

5    suggestive of such violence.  It's bad judgment to have a gun and

6    to be taking Ambien, but it doesn't say that this is the kind of

7    man who is stalking, that's threatening.

8    There is no allegation within this letter or within those

9    five interviews about pointing a laser -- a laser sight at -- at

10   Jane Doe.  There is nothing in there of that nor was there

11   anything about the sexual batteries.

12   There's one allegation, and we flagged it in our brief, that

13   said, hey, she says she didn't say "no," he had sex with her, and

14   she didn't like it, and she didn't consent.  Well, that was it.

15   And we flagged it.  We said, "Look: this is -- this is kind of

16   dropped to the side, but, like, this is uncomfortable."  This

17   is -- this is something that the Court should know.  We're not

18   trying to hide anything from you.

19   But the other aspect of it is that her -- her injuries --

20   those that have been reported here -- were from the sex toys that

21   she would use on these videos.  This wasn't something that --

22   that she got from the defendant.  This was something that was a

23   product of what she was doing on camera.

24   So this isn't something that we're, like, if you have the

25   manipulation, that might be something to say, like, you're a bad

1    man, and you should have a no-contact order, but there's nothing

2    of the violence that says you have to be detained, that nothing

3    short of detention will meet the factors that the congress has

4    laid out and that *Dominguez* demands this Court walk through.

5    And when you go back to what you -- you addressed

6    initially -- the weight of the evidence -- the weight of the

7    evidence is the first five times she's interviewed.  And this

8    isn't, like, an ongoing kind of thing.  It's the same core

9    behavior of what they were looking at in Wisconsin.

10    The officer pulls up the Wisconsin statute for forced

11    labor -- the exact charge we're dealing with -- and is, like,

12    "Hey, I just want to walk through the elements"; "let me make

13    sure I've got everything that's there."  And what does she

14    volunteer?  "I was manipulated" -- you know, like, he was just a

15    pretty manipulative guy, but it wasn't that force; it wasn't what

16    we've heard today, and that same theme was not repeated in the

17    next five interviews over the next six weeks.

18    So while we don't have those, we can only say that those

19    should not be given credit, they should not be given credit over

20    what we initially have and what the police officers initially

21    did.  That's what this court should credit.  When the Court looks

22    at that evidence -- and you can imagine what that impeachment

23    would be like at trial -- you have to say, "I have to say, this

24    man is presumed innocent," and that factors heavily within this.

25    And this man being presumed innocent with the fact that I

1    have great concern about the credibility of Doe -- to say I don't

2    know if I can credit these statements.  There's not the

3    corroboration.  We have no text messages corroborating that there

4    was violence of this.  We have no text messages saying that "he

5    did this to me" -- that this is what happened.  No

6    contemporaneous evidence.

7          We have the contemporaneous evidence of a single chat where

8    he says, "Look:  If you're going -- you have to post on

9    Instagram -- that's what drives our business, and you have to

10   post while you're at the -- you know, horseback-riding lessons,

11   because that's what the tax writeoff is for.  That's what we're

12   doing as a business expense."

13         That's just good bookkeeping.  It's the same with any, like,

14   civil lawyers -- Like, "Look:  You've got to talk about business

15   when you go to lunch."

16         You take that away, Your Honor, and you say, "What else has

17   the government said?"  It said, "Well, the horseback riding isn't

18   what he did, because it promoted the theme."  No, he used it as a

19   loophole.  In the second statement that, the government said it

20   was also the only thing that kept her sane.  It was what she did.

21   It was what she wanted to do, and she had access to the funds --

22   the same with the Etsy, the same with the credit cards.  She had

23   that ability.  She had that money in a retirement, and she had

24   that ability to write those $12,000 of checks that we attached as

25   Exhibit F.

1          Your Honor, I think there was a lot of reaching here.  You

2     know, usually when we go back to the -- to the, you know, Lyndon

3     Johnson days to -- to talk about a third-party custodian's

4     inability, you know that's reaching.  By the same token, when we

5     say that that -- that was what Mr. Koeckeritz did when he was 15,

6     that which he did with his ex-girlfriend that we have

7     contemporaneous reports -- we have nothing that shows it -- other

8     than, you know, like, "Well, if Doe says this, and now I'm

9     aggrieved, and I hate him too."

10         That's the sort of thing that we have to look with a skewed

11    eye.  We say it wouldn't come in at trial as 404(b).  It wouldn't

12    come in as relevant.  It has no place.  Now, it doesn't mean that

13    this Court couldn't consider it if there was something objective

14    that you'd say, "You know what:  I'm really concerned about this.

15    This really does give me -- give weight to it."  But this is just

16    the government throwing out in a proffer that these other women

17    hate him.

18         Hating him and being a bad boyfriend and being a terrible

19    husband is not the reason we detain people.  It is that they are

20    a threat.  And here, the real threat is and what the government

21    has said is he likes guns.

22         You know my response already:  He's from northern Wisconsin;

23    he was in the military.  What the government has left out is that

24    his dad -- or I'm sorry -- his step-dad -- to say that he's not a

25    responsible gun owner -- the man used to be a sheriff, and he

1    used to be a prison guard.  There's no reason to think that he's

2    not a responsible gun owner.

3         And the other thing that they make big on is, like, this

4    safe that was buried, but it's not as if law enforcement did,

5    like, the Jimmy Hoffa, and they just started excavating in the

6    backyard, and they found this safe.  It had been put in the

7    backyard into the -- into the garage a year ago, meaning it was a

8    dirty safe that, for some reason, the guy had put there.  And I

9    don't know why he would do that, but it was --

10         THE COURT:  I'm sorry.  Who's the guy?

11         MR. BUGNI:  Sorry.  The father-in-law.  The father-in-law.

12         THE COURT:  Okay.

13         MR. BUGNI:  I'm sorry.  Step-dad.  Sorry.  Step-dad.  I

14    apologize.

15         Yep, the report -- I see it here -- it says the safe had

16    been in the garage for more than a year.  That -- that's the key

17    here.  It's not that there's some contemporaneous evidence that's

18    tying him to it.

19         Now, there's also the allegation of this ghost gun.  Ghost

20    guns aren't illegal.  They can be illegal.  They can be -- what

21    they're usually charged for -- especially in Milwaukee -- is that

22    they're going to get you with a "felon in possession of

23    ammunition," but the ghost gun kits themselves are not illegal.

24    It's illegal to have an obliterated serial number; not to have a

25    gun that isn't.  And the Biden administration is trying to close

1   that loophole, but there's nothing to say that he was not in

2   conformity with gun laws at that point.

3   So then we become guns writ large, guns writ large for an

4   otherwise responsible man with a gun who served in the military.

5   There's nothing that says he's so violent that that is going to

6   be it.  That, like, we have a real fear -- we have an articulable

7   fear that he is going to arm himself and go after Doe.  I have

8   not heard that today.  I have not heard anything that bridges

9   that -- that gap nor anything that actually would suggest that.

10  Other than the -- Doe's own words to say "I fear because of

11  those two incidents when he was on Ambien and he was not

12  responsible."  That's it.  There is nothing that gets you from

13  that -- from being irresponsible on Ambien twice that he doesn't

14  remember it and he denies till, like, he is now going to go after

15  Doe.  There's no allegation that for the four -- five months that

16  he was in county jail -- that he ever tried to contact Doe, that

17  he ever tried to do anything to Doe.

18  And the other aspect that the government has launched into

19  or alluded to, I guess, is that Doe's afraid of what's on the

20  cloud that he would actually access.  I don't know what that is.

21  I've heard nothing of what -- what that would be that would

22  embarrass her or what that would do, and we don't allow for,

23  like, a vague notion that, like, he might be able to access, you

24  know, like, information on the cloud to say "you can't be

25  released" if we don't know what that information is.  We don't

1   have anything that is articulable.  We don't have any specific

2   allegation that "this is what I fear from Austin Koekeritz."

3       Austin Koekeritz -- if he's released -- will sit in that

4   room; he'll sit in that house; he'll prepare his defense, and

5   he'll be entitled to the presumption of innocence that he is

6   under the Bail Reform Act.  That's what he'll do.  He'll be on a

7   very tight leash.

8       And the idea that -- that she thinks because he has a degree

9   in psychology -- that he's going to outsmart the U.S. Probation

10  Office, that he's going to be able to, like, work around that

11  which -- we've seen some pretty good criminals in these

12  courtrooms -- that, like, they -- like, they're just, like, "Oh,

13  well, he got us" -- no.  They're always a step ahead, and he's

14  going to be on the shortest leash possible.

15      You Honor, I would also go to, like, someone else did it to

16  attack his veracity.  Until today, we never heard any allegation

17  of him viewing child pornography, that there was child

18  pornography on these devices; we've never heard from the

19  government that child-pornography possession or receipt is going

20  to be one of the charges they're contemplating, that there is any

21  evidence to substantiate her allegation of it.

22      It shows that this is a smear campaign.  It's a smear

23  campaign against Mr. Koeckeritz, trying to get it so that if we

24  throw enough at him, if the tidal wave hits, they're not going to

25  be able to defend it all.  And the only way we defend it, Your

1   Honor, is we stand on the law.  We stand on 3142, and we say they
2   have to articulate it, they have to give you a good reason, there
3   has to be a specific reason that you fear that he is going to get
4   out and that he is going to do something.
5       This Court has -- has probably handled 10,000 release
6   hearings, and that -- the Court knows that's standard, and that
7   standard was not proffered here -- that this is something that is
8   a real fear.  This is somebody who -- maybe he was manipulative,
9   maybe he gaslit her, but he's not somebody who we have
10  articulable and we have no evidence of this violence.  We have
11  her allegation, and that's it.  And so there's nothing else that
12  this Court should use to detain him.
13      If I could just have one moment, Your Honor.
14      THE COURT:  Take your time.
15       (A discussion is held off the record at 12:12 PM.)
16      MR. BUGNI:  Your Honor, the last thing -- and I'm sorry --
17  I'm really losing my voice now --
18      THE COURT:  And the record should note that you are
19  suffering from a terrible head and chest cold.
20      MR. BUGNI:  I appreciate that, Your Honor.
21      THE COURT:  Well, I feel sorry for Ms. Blair; not you.  She
22  has to sit next to you.
23      MR. BUGNI:  Yeah.
24      MS. BLAIR:  My immune system is getting better.
25      MR. BUGNI:  It's the kids, man.

1          THE COURT:  All right.  Back to you, Mr. Bugni.

2          MR. BUGNI:  Sorry, Your Honor.  I would just also point out

3     that his mom, Sonia (ph), is here, and I would call her if the

4     Court had questions about her as a third-party custodian.

5          THE COURT:  It's not about the custodians.

6          MR. BUGNI:  Okay.  Then I have no -- nothing else to proffer

7     other than that.

8          THE COURT:  Okay.  I try to be transparent.  You know that.

9     So let me ask a couple of interrelated informational questions.

10          The government proffered a couple of different strands of

11     information about Mr. Koeckeritz that could be viewed as

12     intertwined.  One is this infatuation with acting like a cop.

13     The other is the information from the ex-wife and the former

14     girlfriend and about how he -- he kept momentos and kept ID

15     documents and kept a lock of hair.  As one of them -- I think it

16     was the ex-girlfriend -- or it might have been the teenage

17     girlfriend -- which, of course, is part of the backside -- okay.

18     That's just creepy.  That's not a legal term, but I think it's

19     accurate.

20          What would you have the Court make of this proffer in terms

21     of what the Court should expect from Mr. Koeckeritz going forward

22     if released?

23          MR. BUGNI:  So I think two things:  One, I hate -- we

24     just -- my inlaws just moved out of their house after 40 years,

25     and we found my wife's letters from her eighth-grade boyfriend in

everything else that she had there. I don't know why people keep things and they forget things, but I don't think that the lock of hair was put up on the mantelpiece as, like, you know, "This is really, like, what I care about most." Probably like most people -- your 14-year-old girlfriend -- it's put somewhere else and then, like, finally somebody actually went through and actually went through all the boxes and was, like, "What is this?" And they're, like, "Oh, that's creepy," but it's something that, you know, you otherwise would have forgotten about.

I don't think you have to worry at all about him. I think -- I think you have the leash. You have both, like, the federal shock and awe, of, like, you know, "Look: This is what's come down on you."

I think you have an otherwise exemplary life of -- of holding to the law. You have a speeding ticket when he's 19. I don't know what happened with the allegations from 2015. I know that I'm told that they were expunged, but the idea that the police report is actually -- becomes the end-all/be-all -- like, I mean, that's every defense lawyers dream to, like, go and cross-examine the police report.

Like, clearly the DA thought, "Look: You know, like, this should be expunged. It's not something that we wanted to besmirch this guy's record."

Now, when it comes to the ex-girlfriend and everything else

1    with that -- I don't know.  He had a security company called

2    "Cuff," and if he's wearing that as part of "Cuff" -- you know,

3    like -- okay.  Like, maybe he looks more like a cop than he

4    should, but that's most security guys.  When you go to any place,

5    they look just like an officer.

6         Now, is it such that you have to worry that he's going to go

7    and violate because he's going to impersonate a cop?  No, I

8    don't -- I don't think so at all.  I don't think that's a problem

9    at all.

10        And the reason we -- we don't see that is -- maybe that was

11   an example of bad judgment seven years ago when he was 22, and

12   maybe he keeps some momentos -- and we saw one picture in there

13   in the -- in the state court pleadings because they had made a

14   big deal out of that in state court; and so his lawyers got,

15   like, the pictures of it and everything.  And they -- they just

16   don't look like that.  You know, they just bought it off Amazon.

17   You know, like, they're just, "Cuff" -- you know, whatever it

18   might be.  Or, like -- one was just even almost comical.

19        So I don't think it's a matter of, like, he's really the US

20   Marshal who's trying to pose with everything else that it would

21   be.  So I don't think that portends to, you know, risk a flight,

22   and it doesn't portend a risk of danger to the community.

23        THE COURT:  Okay.  Thank you.

24        Informational question that may require some interpretation

25   by you.  You've referred to, and the Court is aware of the fact,

1    that state charges were brought first, and my recollection is

2    that he was kept in jail because the bond was too high.  Am I

3    recalling correctly?

4          MR. BUGNI:  That's right.  Yeah.

5          THE COURT:  Okay.  Do you know -- I don't mean to make this

6    a pop quiz.  Do you know how high the bond was?

7          MR. BUGNI:  It was set at 350, and then I believe it was

8    reduced.  And then right before the -- the hearing -- I think it

9    was three days or maybe a day before -- they were -- they were

10   having a hearing because that's when the investigation was

11   starting to fall apart.  That's when, you know, like, we were

12   start- -- they were starting to get stuff to defense.  Defense

13   filed a very significant memo.  I think it was, like, 250 pages.

14   And that's where we had gotten --

15         THE COURT:  A probable-cause memo?  I mean, were we

16   talking -- what -- what's the hearing?

17         MR. BUGNI:  No, I apologize.  A bond memo.  A bond

18   reduction.  They were going to ask for it.  I believe it was,

19   like, days after the indictment comes down.  That's when they

20   were going to have that hearing, when they were going to start to

21   hear the evidence, where they're going to say, "Look:  There's

22   actually another side to this."  Because unlike federal, sate --

23   you have to wait a long time before you get the discovery.

24         And so they had nothing initially other than sort of, like,

25   you know, your *ex parte* search warrant applications.  You're,

1   like, "Well, this is terrible."  Then you get the -- the

2   interviews, and you're, like, "Well, this is not terrible"; like,

3   "Let's go parse this a little bit more."

4          So that -- they were -- they were anticipating that he would

5   be released on bond, and then he's indicted and picked up two

6   days before that hearing.

7          THE COURT:  Okay.  Last question, and then I'm going to

8   check in with Mr. Sutor.

9          And I can predict your answer, but I'm going to ask it

10  anyway.  You've made it clear that you think Jane Doe is lying.

11         MR. BUGNI:  Yes.

12         THE COURT:  And that it's a swearing contest.  At the

13  outset, I pointed out to everybody that one of the things that

14  the Court takes into account is a fear by a victim of the release

15  of a defendant.  And I don't remember the defendant's name.  I

16  remember the case.  I remember the defense attorney.  But I've

17  actually used that as a basis to detain someone.  What would you

18  say in response to that here?

19         MR. BUGNI:  Yeah, I think I actually -- I thought it was

20  with me, actually, that you -- that you had done that, but I

21  think it was --

22         THE COURT:  It was with Mr. Eisenberg.

23         MR. BUGNI:  Okay.

24         THE COURT:  Maybe I've done it twice.

25         MR. BUGNI:  Yeah.  At least you've -- you've -- so I think

it's when you have the person who has a true infatuation.  That's
sort of like -- you know, like -- I think that goes to the
dangerousness.  You know, like, where we've had a few people
where -- you know, there's "creepy," and then there's, "No, no.
Like, that's a real problematic dude."  Like, that dude lives for
that person.

And that -- that I think is what it goes to -- is where you
have -- like, this person has built a life around this fantasy
with that person that they met online, and then they traveled,
and that's what -- you know, they're going to run back to that.
They're going to go run to them.

That's not this at all.  Like, there's nothing within the
last five months of being in county jail of contacting her.  If
anything, it seems it was acrimonious.  You know, like, that --
that's what it would be.

I think it -- so your principle is I'm willing to let that
weigh within the calculus, but I think it has to be in- -- but
the principle has to be informed does this seem to be the kind of
case where that would actually happen, because I think we've had
other cases where the victims have said, "I don't want them" --
you know, "the guy being released," and it's, like, well, he's
going to the other side of the state.  He's going to be on
lockdown twenty-four-seven.  There's no reason to think that he's
going to go and do that.  That's where I think the -- that's the
understanding that informs the principle, and I think that's the

1      same case we have here.

2           THE COURT:  Okay.  That answers my question.  Thank you.

3           Mr. Sutor, we've had at least an hour and a half -- almost

4      two hours of presentation here.  Do you wish to add anything

5      either by way of observation or any questions that you have for

6      either side at this point?

7           AGENT SUTOR:  No observations or questions for either side.

8      I do have additional information that has just come through my

9      phone.  Officer Brad Schalow up in the Eau Claire office was able

10     to do a home assessment of the grandmother's residence yesterday

11     evening.

12          THE COURT:  Okay.  That would be the -- the residence on 416

13     7th Street, South?

14          AGENT SUTOR:  Correct.

15          THE COURT:  Okay.

16          AGENT SUTOR:  So the home itself checked out -- just a

17     single-bedroom apartment.  There is a new issue that presents,

18     though, in which if Austin were to be living with his

19     grandmother, the landlord -- or he would have to be accepted onto

20     the lease.  So he would need to apply and then, like, you go

21     through, like, a screening process.

22          THE COURT:  Okay.  Wait.  Are we talking about the mother's

23     house or the grandmother's house?

24          AGENT SUTOR:  Grandmother's house.

25          THE COURT:  Okay.  So I fed you the wrong address.  The

1     grandmother lives at 627 Second Street.

2          AGENT SUTOR:  Correct.

3          THE COURT:  Okay.

4          AGENT SUTOR:  So he would need to be approved by the

5     landlord in order to live there, which could take up to, you

6     know, a couple of weeks.  That could be an issue because if you

7     just simply Google search his name, these charges are going to

8     come up.  So it's unknown if he would actually be able to live

9     there or not.

10          THE COURT:  Understood.  All right.  In light of the

11     proffers from both sides and the information that's been

12     presented to the Court, what is your recommendation today?

13          AGENT SUTOR:  Detention.

14          THE COURT:  Do you wish to expand at all, or is it just

15     based on what's in the report?

16          AGENT SUTOR:  What's in the report and just further on what

17     the government provided today.

18          THE COURT:  Okay.  And you don't find Mr. Bugni's argument

19     persuasive?

20          AGENT SUTOR:  No.

21          THE COURT:  Okay.  Thank you for your input.

22          Mr. Kuperstein, I'll -- you've got -- I'll give you a chance

23     to reply, but I'm going to give Mr. Bugni and Ms. Blair the last

24     word, save for the Court, because the burden is on

25     Mr. Koeckeritz.  But did -- did you wish to reply in any fashion

1    to Mr. Bugni's presentation?

2        MR. KUPERSTEIN:  Very, very briefly, Your Honor.

3        The point of the -- of -- quickly addressing the ghost

4    gun -- the point of the evidence really there isn't so much as

5    whether the possession of the firearm was a problem; it's more

6    so -- or the possession itself was illegal -- but more so that

7    the government believes that the defendant is capable and

8    knowledgeable of getting his hands on firearms that are not --

9    that would not otherwise be traceable.

10       Your Honor, I heard a lot about 404(b) evidence and what's

11   admissible and what's not admissible.  We are here today to take

12   the data points that we have, which -- all of which have

13   necessarily occurred in the past, and present our best

14   explanation to the Court so that -- so that Your Honor can use

15   your best judgment to determine what the safest course is in the

16   future.

17       We can't -- we can't predict the future, but what our --

18   what our information that we have shows is a repeated cycle of

19   violence.  It's not one incident, and it's not another incident.

20   If the Court is to give the weight of these transcripts that

21   are -- you know, one of which was the day that Jane Doe was --

22   was rescued after being so afraid to -- to con- -- to speak with

23   police, that she had to drop a note in a secure location on the

24   property and let police know through an intermediary that the

25   note, explaining her situation, you know, where -- where it was.

1      She hid it behind an ADT sign -- that's how scared she was.

2          To the extent that the Court takes into account any of these

3      transcripts, I would encourage the Court to take into account the

4      full transcripts, not merely what was highlighted.  For instance,

5      you know, much was made -- highlighted of "and what kind of

6      manipulation would he do?"  Guilt-tripping a lot, and much was

7      made about guilt-tripping being the only form of coercion, but

8      the next -- the very next page -- "did he ever threaten you with

9      anything?"

10         "Yeah, he's hurt me on times.  The scariest thing he did --"

11     THE COURT:  Okay.  It's like civil attorneys.  Page, please.

12     MR. KUPERSTEIN:  Oh, I apologize, Your Honor.

13     THE COURT:  For Mr. Bugni's benefit.  Not mine.

14     MR. KUPERSTEIN:  Page 12, Exhibit 18-1.  You know, I did

15     civil practice for two years.  I should know better.  I apologize

16     Your Honor.  18-1, page 12.

17         The very next page, she talks about the scariest thing he

18     did was "one time when he was super high on Ambien, he was

19     chasing me around the house with a loaded AR-15."  Didn't happen

20     to be highlighted.

21         "When he chased you, how did you know it was loaded?"  This

22     is page 13.

23         "Because he keeps it in the closet, loaded, in case somebody

24     breaks in."

25         So I understand Mr. Bugni has a duty to his client to

1    present the things in the -- the evidence in the best light for

2    his client.  I understand.  But I would urge the Court not to

3    rely on tiny little highlighted portions, and instead view --

4    view these transcripts in their entirety, knowing that the

5    allegations were far beyond this, and knowing that these

6    allegations are not only Jane Doe's allegations but, at certain

7    critical points, intersect allegations made by the defendant's

8    own minor family member.

9        THE COURT:  What would you make of Mr. Bugni's proffer that

10    the half-sister blames Jane Doe as much as she blames her

11    half-brother?

12        MR. KUPERSTEIN:  So, Your Honor, what I would make of this

13    is the same thing that I would make of any victim of familial

14    domestic sexual violence is that oftentimes -- oftentimes, the

15    motivations and fears and emotions of everything are so high in

16    the beginning, that it takes some time for -- and trust building

17    in order to get the full -- full account from -- from victims of

18    these crimes.  For -- you know, in the beginning -- or in one of

19    the interviews -- either the first interview or the second

20    interview with the minor victim -- I don't recall -- she asks for

21    an opportunity to speak with her mother and asks the officer to

22    step out of the interview room.  He does.

23        When the officer comes back -- and he turned off the

24    recording for this -- he told her he was going to do that -- he

25    comes back, and he observed that she's crying, and she says, "I

1    don't want to get --" you know, "I don't want to get -- I didn't

2    want to get Austin in trouble" -- I'm not -- this isn't a direct

3    quote, but this is the substance of the -- "I don't want to get

4    Austin in trouble, but what he did to me was really messed up,"

5    and it took some time to get there.

6        And, Your Honor, I would also note that --

7        THE COURT:  Did they have the same mother or the same

8    father?

9        MR. KUPERSTEIN:  They had the same father.

10       THE COURT:  Okay.

11       MR. KUPERSTEIN:  And the father, I don't believe -- I

12   believe the father was reported to not be in the picture for at

13   least the defendant.  I'm not sure really about that beyond

14   having recalled read that maybe in a -- in one of the pretrial

15   reports.

16       I will also note that in an interview that -- the minor

17   victim said that the sexual assault that occurred was performed

18   without consultation of Jane Doe.  It wasn't -- it wasn't

19   discussed with her ahead of time.  It was a discussion between

20   the defendant and the -- and the minor.

21       THE COURT:  And we're talking about the South Dakota

22   incident?

23       MR. KUPERSTEIN:  No, Your Honor.  The --

24       THE COURT:  The filming -- or the photo shoot?

25       MR. KUPERSTEIN:  The assault.

1          THE COURT:  Okay.

2          MR. KUPERSTEIN:  The assault.  Not -- not in South Dakota --

3     I'm sorry -- not the South Dakota assault -- the assault of Jane

4     Doe.

5          THE COURT:  Got it.  Okay.

6          MR. KUPERSTEIN:  So -- so, Your Honor, again, what we have

7     is repeated accusations of a pattern of conduct with -- with

8     these women, and just -- it doesn't seem -- it doesn't seem

9     appropriate to reduce it to no corroboration or -- or here's an

10    instant -- instance here or an instance there, and take them --

11    it all together suggests a very disturbing and dangerous pattern

12    of conduct that doesn't seem like it's going to behave.

13         To address a specific point about some of the checks, I'll

14    defer to my cocounsel.

15         MS. KRAUS:  And, you know, Your Honor, I know there's been a

16    lot of discussion about the financials here.  It is a complex

17    financial situation.  And I think, in sum, when we look at this,

18    it is a sophisticated way to conceal the proceeds of this forced

19    labor, and I want to make it clear that the defendant is the

20    individual who incorporated this company.

21         The Jane Doe denies any involvement in the incorporation of

22    this company or any of the financial arrangements.  It is a

23    complicated scheme in which he set up three bank accounts tied to

24    this company.  The sole bank account that received any of the

25    money from the streaming websites -- the proceeds -- that bank

1    account was controlled exclusive by him.

2       He then transferred small portions of this money into the

3    account that's referenced with these checks here.  These checks

4    were written from a separate account than that which received the

5    streaming deposits.  The defendant is the person who then

6    transferred that money there and allowed Jane Doe -- it was

7    called an "operating account" -- to make specific purchases

8    related to this company.

9       He also -- you know, and through other financial, you know,

10    records here -- he is the person who controlled these investment

11    accounts.  He is the person who assisted or at least suggested

12    that Jane Doe create these investments accounts.  He already had

13    investments accounts at this entity, and it's her -- you know, in

14    subsequent interviews, she explained he would have her write

15    blank -- sign blank checks.  He would ask her to sign these

16    checks.

17       This was a highly monitored account, and she had extremely

18    limited access to it.  She did not have access to the account

19    that received over $300,000 in proceeds from these streaming

20    companies.

21       And so I think it's important to note here that while on the

22    surface, it appears she had access to money, the structure of

23    these accounts and how they were used and controlled by the

24    defendant is really important -- that he monitored this, and this

25    was not someone who had the access to writing, you know, as blank

1    checks or taking out money as she wanted, and it's also -- again,

2    she may have had, in name, access to these accounts; but the

3    reality is that he controlled the finances here, and this is not

4    something that he had input or knowledge about to large extent.

5         So -- so for what it's worth, you know, we maintain here

6    that while she may have written checks, this was part of a very

7    calculated and controlled financial operation.

8         THE COURT:  All right.  Thank you.

9         MR. KUPERSTEIN:  Your Honor, may we have the Court's

10   indulgence for one minute.

11        THE COURT:  You may.

12         (A discussion is held off the record at 12:31 PM.)

13        MR. KUPERSTEIN:  Your Honor, I just wanted to make sure that

14   I heard something correctly.  I think -- I think during Your

15   Honor's earlier remarks, you said that the defense has the

16   burden.  I just wanted to make it clear for the record -- we

17   understand that -- that there is a -- a presumption that needs to

18   be rebutted.

19        THE COURT:  Right.  Let me cut you off there.  If -- if

20   those were the words I used, they were inartful.  As we all know,

21   under 3142, the government has the burden to prove detention; but

22   in certain cases -- including this one, based on the nature of

23   the charge -- there is a presumption of detention that can be

24   rebutted.

25        And as you all know, under Seventh Circuit law, it's viewed

1    as a bursting-bubble presumption:  Once an adequate plan is

2    presented, the presumption is gone as a presumption, but it is a

3    factor among all the other factors for the Court to consider, and

4    that's certainly what the Court intends to do here.  Does that

5    help?

6         MR. KUPERSTEIN:  Thank you, Your Honor.  I appreciate that.

7         Your Honor, finally -- I mean, the government certainly

8    argues that defense has not overcome any presumption that -- that

9    we have shown that Mr. Koeckeritz is an extraordinarily dangerous

10   person who will continue to -- to act in the way that he's been

11   acting.  I think the last piece of information that I wanted to

12   provide the Court is a text which I did provide to defense

13   yesterday.

14        One final message between Jane Doe and Mr. Koeckeritz where

15   she sent -- where Jane Doe says to Mr. Koeckeritz, "I got sick on

16   myself, and everyone says it -- say it -- I need to shower."  So

17   she's talking about getting sick on herself during a -- one of

18   these streams.  And below that text are a series of numbers, and

19   these numbers are indications of how many tokens she had earned

20   from different streaming platforms.  Tokens can be converted into

21   currency.  So it's as good as money, basically.  Once -- once

22   you're tipped tokens, you can eventually exchange those for

23   money.

24        So she says, "I got sick on myself.  I need --" you know, "I

25   need to take a shower -- everybody says so -- and here are the

1   tokens that I earned tonight."  And the response from the
2   defendant is:  "Really need to stop this.  Meals, exercise, and
3   all other routines are coordinated around a schedule, and you
4   getting off this early keeps screwing everything."

5       It would be hard to come up with a better example of the
6   manipulation and casual cruelty which Mr. Koeckeritz operated,
7   and we -- we believe that there are absolutely no conditions of
8   release that will keep him from trying to do harm to Jane Doe as
9   well as any other women who may fall prey to his schemes.

10          THE COURT:  All right.  Well, thank you.

11          Mr. Bugni, you get the final word.

12          MR. BUGNI:  You said you're not going to be moved by the
13   financials.  So I'm not going to touch that.

14       I would just note:  I didn't highlight the AR-15, because I
15   brought it up in the sentence -- in the memo.  So I didn't really
16   think I needed to highlight it.  You know how to read.  And I
17   haven't hid the ball on any bad fact.  You know, I've embraced
18   everything.

19          THE COURT:  Right, Mr. Bugni.  You've got clean hands.
20   Don't worry about that.

21          MR. BUGNI:  The one thing I would point out, Your Honor, is
22   this is not the best evidence that you would have.  This is
23   actually -- probably just shows that all you have is gaslighting
24   and manipulation.

25       If you have force, you'd have a text that says, "Why did

1     you --" you know, "You left a mark on me"; "You kicked me"; "You

2     punched me"; "You did hot grease on me" -- that's what you would

3     have.

4           I've done what?  Five cases with Ms. Pfluger with sex

5     trafficking, and, like, we know what the evidence is.  The

6     evidence is -- is this is not -- this is manipulation.  This is

7     exactly what she says when she's asked.  When he lines up the

8     statute and says, like, "Look:  I've got to figure out if I've

9     got enough for probable cause."  And "What did you do?"

10          "He manipulated me."

11          You know, and, like, I get it.  I get that the Ambien would

12     be scary to have somebody chase you around with a gun.  No

13     question.  That's just uncalled for, but that's not what he's

14     doing to cause her to do this.  That might have been, like, part

15     of what happened, but there -- there's no aspect to this where

16     it's, like, "I did this to cause you to do that."

17          Instead, what you have is manipulation, and manipulation is

18     not why we detain someone.  Manipulation is not what we say -- if

19     the real fear is he's going to go out and do this to other

20     women -- well, that's not even going to be -- like, that's not

21     even part of our plan.  Our plan would never allow for that.

22     There's no way that Brad Schalow is going to allow him to go out

23     on dates.  He's going to be on the tightest leash possible.

24     There is no world where this man is going to possibly be able to

25     repeat this behavior while he's on pretrial supervision until

1    May, when he clears his name with a not-guilty verdict on these

2    charges.

3         THE COURT:  All right.  Thank you.

4         It -- it's a troublesome case on a lot of levels.  I don't

5    have a good sense of drama.  So I'm going to give you the bottom

6    line, then I'm going to back-fill.

7         I am detaining Mr. Koeckeritz, and here's why: Mr. Bugni has

8    adequately pointed out -- and I think when I say "adequately,"

9    he -- based on what little he's got, he's pointed out that this

10   is not a slam-dunk case for the government.  It may come down to

11   a swearing contest; and right now, Mr. Bugni says, "Don't believe

12   Jane Doe."  "She's lying.  And the proof is in the transcripts."

13        Well, Mr. Koeckeritz is -- Koeckeritz -- is presumed

14   innocent.  We all know that.  We're starting with that.  Nothing

15   that happens today is going to change the presumption of

16   innocence.

17        And it may be, Mr. Bugni, that if this case goes to trial --

18   that he is acquitted by a jury.  But that's not today's concern.

19   The government's going to present its best case.  It's got the

20   burden to prove it beyond a reasonable doubt, and maybe the

21   elements aren't going to line up.

22        Today's question is are there conditions of release that

23   this court can impose that would both assure that Mr. Koeckeritz

24   appears in court and that he is not a danger to anyone else in

25   the community, and -- and I find that the government has shown

1    that.  The plans are there.  I think the best plan would have

2    been with the grandmother.  But it's not about the plans.  It's

3    about Mr. Koeckeritz.

4         And I don't know Mr. Koeckeritz.  I've never met him.

5    Today's the first time I've ever seen him.  But I think the

6    government has presented enough data points to crystallize a

7    picture of a man who is vindictive, obsessive, and dangerous.

8         Yes, it could be interpreted other ways.  It's -- it's like

9    pointillism -- you can pick a particular point and say there's no

10   red there; you back up -- there's red, there's pinks, there's

11   blues, and you look at the totality of circumstances, and what

12   I'm seeing here is a man who has access to the dark web; would

13   probably use the dark web; he likes to act like a cop.  And I get

14   it -- he had a job as a security officer -- but we've got this

15   pattern of conduct -- and we're not going to go back to L. B. J.

16   with the gramma and Nixon and all that, because we're not

17   there -- but a pattern can occur over time.  And what I'm seeing

18   here is, to use Mr. Bugni's phrase, "a really problematic dude."

19        The government said he's manipulative and engages in casual

20   cruelty.  Well, that's probably true, but that's not a basis to

21   detain him.  Men and women are cruel and manipulative to their

22   partners a lot, and that's not a federal crime, and that's not a

23   basis to detain them.

24        But here, what we've got -- at least according to Jane Doe,

25   whom the defense thinks is lying -- is a pattern of physical

1    cruelty, psychological cruelty, financial manipulation that puts

2    her in genuine fear for her safety.  The defense says that's

3    unrealistic; don't go there.  I believe it.  I'm going there.

4    I'm detaining Mr. Koeckeritz.  It may turn out at the end he's

5    not convicted, but I am persuaded that he is detainable and that

6    the government has met its burden.

7        That's all I've got.  It was the government's motion to

8    detain.  Anything else before we adjourn today?

9        MS. KRAUS:  Your Honor, we do have the -- I believe Your

10   Honor wanted us to file the messages that we referenced.  Would

11   you also like us to also file a copy of Jane Doe's statement?

12       THE COURT:  You can do that whenever.

13       Something else that I wanted to talk about while we're all

14   here, but it doesn't have to be while the marshals and

15   Mr. Koeckeritz are present, is pretrial motions and whether the

16   parties have had a chance to talk about that.  But let's take it

17   one step at a time because I want to let Mr. Koeckeritz and the

18   marshals go.  It's been a long morning and early afternoon.

19       Mr. Bugni, anything else today before we adjourn the

20   detention hearing?

21       MR. BUGNI:  We can take it up outside the marshals.  I just

22   had one small matter.

23       THE COURT:  Okay.  Then so it's okay if I excuse your

24   client?

25       MR. BUGNI:  Well, maybe he should hear it.  I just -- I just

1    want -- I can just -- it'll be real brief.  The Court -- you sat

2    through a very long hearing.  I did not think it was going to be

3    this long.  If we -- when we get the discovery, we're going to,

4    of course, go back.  If there is a Side B to any statement

5    there --

6         THE COURT:  Sure.  Mr. Bugni, I think I know where you're

7    going.  I will never close the door to a motion for

8    reconsideration.  If something new comes up and you think it's

9    material and the court should see it and hear it, let me know.

10   We'll hear from the government then; and if necessary, we will

11   reconvene and hold a followup hearing.

12        MR. BUGNI:  Okay.

13        THE COURT:  Is that where you were --

14        MR. BUGNI:  I was just making sure that it wasn't going to

15   be an appeal, that I could go to you in the first instance

16   within -- once I get the discovery.

17        THE COURT:  Right.  Well, and as you know, just as a -- as a

18   matter of procedure, you can't appeal on something that wasn't in

19   front of the --

20        MR. BUGNI:  Correct.

21        THE COURT:  -- deciding court.  So if something new comes

22   up, yes, bring it to me.  If you just want to appeal what I've

23   already done, you know how to do that, and it's clear enough that

24   that's not your intent today.

25        MR. BUGNI:  Correct.

1          THE COURT:  Anything else, then, before we excuse

2     Mr. Koeckeritz?

3          MR. BUGNI:  No, Your Honor.

4          THE COURT:  Okay.  So the detention hearing is over.  We're

5     going to excuse the defendant.  I'll excuse Mr. Sutor if he

6     wishes to go.  But I'd like counsel to stay so we can talk about

7     motions practice.

8              (Defendant exits courtroom at 12:43 p.m.)

9          THE COURT:  All right.  I'd like to keep this informal.

10    Have you had a chance to talk about it?

11         MR. BUGNI:  No, we haven't.  We have not discussed --

12         THE COURT:  Okay.

13         MR. BUGNI:  My understanding is we will file a motion.  We

14    looked at what the State had filed -- or the State lawyers had.

15    There's a few search warrants that we're going to challenge, but

16    we also just don't know what lines up with what would be

17    relevant.  So, like --

18         THE COURT:  Okay.  Well, let me suggest this -- and I think

19    in my previous order, I indicated that the "not later than" date

20    for an actual evidentiary hearing is going to be March 10.  So

21    I'm not going to make you sit here and shoot from the hip --

22    "you" being either side -- but the government has to figure out

23    what is its comfort level for the last day on which it wishes to

24    see a motion including any request for an evidentiary hearing on

25    a motion and then find out, okay, is April -- is March 10 going

1    to work for everyone, or does it have to be earlier.  It cannot

2    be later, because you all know the way the schedule works.  I

3    have to give you time to brief it.  I have to get a report

4    recommendation to the judge; but other than that, I'll let you

5    guys sort it out.  It's early February, but it's going to be

6    early March before you know it.  So obviously you guys need to

7    sort this out.  Okay?

8         MR. BUGNI:  Absolutely.  I --

9         MS. KRAUS:  I --

10        MR. BUGNI:  I'm sorry.

11        THE COURT:  Yeah.  I'm sorry.  Go ahead.

12        MS. KRAUS:  To repeat, Your Honor, the motion hearing would

13   need to be scheduled no later than March 10th.

14        THE COURT:  Yes.

15        MS. KRAUS:  Okay.

16        THE COURT:  And then briefing would follow.

17        MS. KRAUS:  Yes.  Understood.  Just want to make sure we use

18   that day as a date to keep in mind.

19        THE COURT:  Right.  And so the motion-filing deadline would

20   have to proceed that within the government's comfort level.

21        MS. KRAUS:  Yes, we understand.

22        THE COURT:  We tracking?  Okay.

23        MR. BUGNI:  We do.  I just want to -- I can offer this -- I

24   mean, I -- I hope my word is bond, but I -- right now, from what

25   we have from the State, I don't see it being an evidentiary

1    hearing.  It would just be straight-up challenges to the search

2    warrant, and I don't think it's a *Franks* issue, from what we

3    have.  But, like --

4          THE COURT:  Sure.

5          MR. BUGNI:  -- I'll let the Court and opposing counsel know

6    as soon as we know --

7          THE COURT:  Sure.  Well, like I said:  Nobody has to shoot

8    from the hip today.  I just thought that if you had already

9    figured it out, we could put it into the record; but if you need

10   some more time, then just let the Court know.  I mean, even a

11   letter would be fine.

12         MR. BUGNI:  Okay.

13         THE COURT:  Okay?  Anything else before we adjourn on behalf

14   of the government?

15         MS. KRAUS:  No, Your Honor -- yes.  If you wanted the

16   government to file a copy of Jane Doe's statement into the

17   record.

18         THE COURT:  Yes.

19         MS. KRAUS:  You do?  Okay.  Thank you.

20         THE COURT:  And, of course, it's under seal.

21         MS. KRAUS:  Yes.

22         THE COURT:  Just put a sticker on it -- whatever number

23   you're up to -- and I don't need to see it now, but I want the

24   record to be self-contained.

25         MR. BUGNI:  Got it.

1          THE COURT:  Anything else on behalf of defense today?

2          MR. BUGNI:  No, Your Honor.  Thank you.

3          THE COURT:  Then we're done for today.  Thank you all.

4          THE CLERK:  This Honorable Court is in recess.

5                    (Proceedings concluded at 12:46 PM.)

6                              ***

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   I, PHILIP C. HARRELSON, Certified Realtime and Merit Reporter in and

2   for the State of Wisconsin, certify that the foregoing is a true and

3   accurate record, transcribed to the best of my ability, of the

4   digitally recorded proceedings held on the 2nd day of February 2023,

5   before the Honorable Stephen L. Crocker, Magistrate Judge for the

6   Western District of Wisconsin, and reduced to writing in accordance

7   with my stenographic notes made at said time and place.

8

9

10

11

12                          Dated this 4th day of March, 2023.

13

14

15

16                              /s/ Philip C. Harrelson

17                          Philip C. Harrelson, RMR, CRR
                            Federal Court Reporter
18

19

20

21

22

23

24  The foregoing certification of this transcript does not apply to any
    reproduction of the same by any means unless under the direct coal
25  and/or direction of the certifying reporter.